REID COLLINS & TSAI LLP
Jeffrey E. Gross
P. Jason Collins
Vincenzo Novelli
330 West 58th Street, Suite 403
New York, NY 10019
Tel.:  212.344.5200

Jordan L. Vimont, Sr. (*pro hac vice*)
1301 S. Capital of Texas Hwy
Building C, Suite 300
Austin, Texas 78746
Tel.:  512.647.6100

*Counsel to Joint Official Liquidators of Madison Asset LLC*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARTIN NICHOLAS JOHN TROTT and CHRISTOPHER JAMES SMITH, on behalf of and solely in their capacity as the Foreign Representatives and Joint Official Liquidators of MADISON ASSET LLC (IN LIQUIDATION),<br><br>            Plaintiffs,<br><br>     v.<br><br>DEUTSCHE BANK AG,<br><br>            Defendant. | Case No. 1:20-cv-10299-MKV |

## <u>FIRST AMENDED COMPLAINT</u>

Plaintiffs Martin Nicholas John Trott and Christopher James Smith ("<u>Plaintiffs</u>" or the

"<u>JOLs</u>"), solely in their capacity as the Foreign Representatives and Joint Official Liquidators of

Madison Asset LLC ("<u>Madison</u>"), a Cayman investment fund that is now in official liquidation

proceedings before the Grand Court of the Cayman Islands, bring claims against Deutsche Bank

AG ("<u>Deutsche</u>" or "<u>Defendant</u>") for fraudulent trading under § 147 of the Cayman Islands

Companies Act (2021 Revision, as amended), and respectfully allege as follows:

## I.    INTRODUCTION

1.      The JOLs, on behalf of Madison, bring this case against Deutsche for its role in aiding a fraudulent trading scheme orchestrated by Madison's former principals and principals of related entities between 2014 and 2017 that caused Madison to suffer more than $200 million in damages. As Madison's bank for custody accounts and as the Issuing Agent, Principal Paying Agent, and Transfer Agent for the fraudulent securities at the heart of the fraud, Deutsche had knowledge that Madison's accounts were being used to perpetuate a fraudulent scheme. Given that Madison was set up as a clearinghouse for settling securities transactions and cash transfers necessary to maintain the BCI Principals' scheme, Deutsche a played pivotal role in carrying out and maintaining Madison's fraudulent business. But instead of halting the scheme and refusing to take part, Deutsche turned a blind eye, continued processing wrongful transfers, and utterly failed to follow any modicum of proper procedures or oversight with respect to Madison's accounts. This reckless failure of oversight in the face of glaring red flags resulted in Madison's accounts being drained and used to facilitate transfers of millions of dollars for fraudulent purposes.

## II.    PARTIES

A.    PLAINTIFFS

2.      The JOLs are the foreign representatives of Madison Asset LLC, an exempted company limited by shares formed on or about January 2, 2014, under the Cayman Islands Companies Law.

3.      On March 12, 2018, Westwood Capital Markets S.A. and Seguros Sucre S.A. (together the "Liquidation Petitioners") presented a petition to the Grand Court of the Cayman Islands (the "Grand Court") requesting that Madison be wound up pursuant to Part V of the Companies Act (2021 Revision).

4.      On July 4, 2018, the Grand Court ordered that Madison be wound up and that Martin Nicholas John Trott of R&H Restructuring (Cayman) Limited (formerly known as RHSW (Cayman) Limited) be appointed as Madison's official liquidator. Shortly thereafter the Grand Court appointed Christopher James Smith of RHSW (Cayman) Limited as a joint official liquidator.

5.      As part of their role, the JOLs sought, and the Grand Court granted, leave to obtain recognition of the Cayman Islands proceedings with the United States Bankruptcy Court.

6.      After receiving the Grand Court's permission, the JOLs instructed United States counsel to file a petition with the United States Bankruptcy Court for the Southern District of New York (the "New York Bankruptcy Court") seeking recognition of the Company's Cayman Islands liquidation proceeding ("Cayman Proceeding") as a foreign main proceeding under Chapter 15 of the United States Bankruptcy Code (the "Bankruptcy Code").

7.      On October 16, 2018, the New York Bankruptcy Court granted recognition of the Cayman Proceeding as a foreign main proceeding under Chapter 15 and found that the JOLs had demonstrated that they were Madison's duly authorized foreign representatives, as defined by section 101(24) of the Bankruptcy Code.

8.      In August 2020, the Grand Court granted the JOLs' request for sanction to bring this Action in the Southern District of New York.

**B.      DEUTSCHE**

9.      Deutsche Bank AG is a German global banking and financial services company with a branch at 60 Wall Street, New York, NY.

### III.   JURISDICTION AND VENUE

10.      This Court has jurisdiction over Deutsche pursuant to 28 U.S.C. § 1334(b).

11.      Venue lies in this county pursuant to 28 U.S.C. §§ 1391 & 1409.

### IV.   FACTUAL BACKGROUND

**A.    THE BISCAYNE GROUP OF COMPANIES**

**1.    The Real Estate Development Company**

12.      Roberto G. Cortes ("RG Cortes") and Ernesto H. Weisson ("Weisson") were the founders, principals, and beneficial owners of a now-failed South Florida-based residential real estate development company, South Bay Holdings, LLC ("South Bay").

13.      By training and experience RG Cortes, Weisson, and RG Cortes's brother, Juan C. Cortes ("JC Cortes," collectively, the "BCI Principals") were brokers and investment advisors.

14.      When founded in 1999, South Bay financed its activities primarily through commercial bank loans and investments from friends and family.

15.      In 2006 and 2007, the BCI Principals sought to significantly expand South Bay, including by acquiring 30 lots of high-end resort property in Key Largo, Florida, on which South Bay would build luxury residences.

16.      To expand and pursue its acquisition plans, South Bay needed additional funding. The BCI Principals solicited investments from their business network of wealthy Ecuadorian families and formed Biscayne Capital, their now-defunct group of wealth management and investment advisory companies, to promote investments in South Bay alongside other traditional investments.

17.      Between 2005 and 2008 the BCI Principals formed several "Biscayne Capital" entities to ostensibly offer wealth management services for their network of investors, including

Biscayne Capital Holdings, LLC (a Delaware corporation), Biscayne Capital (B.V.I.) Ltd. (incorporated in the British Virgin Islands), and Biscayne Capital, S.A., a broker-dealer in Uruguay ("Biscayne Uruguay").

### 2.    The U.S.-Based and Registered Investment Advisor

18.    In 2008, the BCI Principals continued expanding their network of wealth management firms and created their first U.S.-based and registered investment advisor, Biscayne Capital International, LLC ("BCI"). Despite being headquartered in Miami, Florida, BCI was formed to provide wealth management and investment advisory services primarily to non-U.S. Latin American individuals. RG Cortes served as BCI's CEO and JC Cortes as its Chief Compliance/Operations Officer, with Weisson and RG Cortes and JC Cortes's father, Roberto Cortes Rueda ("Rueda"), serving as board members.

19.    To manage client funds and assets, BCI set up custodian arrangements with several banks, including Pershing LLC (Bank of New York Mellon), Deutsche Bank, and Raymond James. Under these arrangements, the accounts held assets beneficially owned by clients, but BCI as the broker or investment advisor had authority to manage the investments in the account (*i.e.,* buying and selling securities, transferring funds to a client's associated bank account).

### 3.    The Special Purpose Vehicles

20.    As investment advisors to their network of investor clientele, the BCI Principals had the ability to steer client funds into the investments that the BCI Principals preferred. Thus, as South Bay began seeking additional capital to fund expansion plans in 2006 and 2007, the BCI Principals began forming special purpose vehicles (each a "Preferred SPV") that created and offered debt securities that, in turn, funded South Bay and other ventures owned by BCI Principals.

21.     Typically formed under the laws of the Cayman Islands or the British Virgin Islands ("BVI"), each Preferred SPV was beneficially owned or controlled by the BCI Principals. Once formed, the BCI Principals would cause the Preferred SPV to prepare offering memoranda and seek to raise capital by selling debt issued by that Preferred SPV ("Preferred Debt") with the stated purpose of raising funds to invest in South Bay to support its development activities. To attract investors, the Preferred Debt typically promised to pay periodic interest. Many of these investors were wealthy Latin American individuals or pension funds that—to the extent they were informed by their advisors as to how funds were invested—were led to believe that the Preferred Debt was more stable than the investments available in their home countries.

**4.      The Scheme Begins**

22.     In their role as investment advisors and wealth managers, the BCI Principals promoted the Preferred SPVs and steered clients into purchasing the Preferred Debt.

23.     First, BCI had its clients execute an "Asset Management Power Entrusted to a Third Party," which gave BCI the ability to make investment decisions on its clients' behalf. BCI would then invest client funds in Preferred Debt, which was lucrative for BCI, because a BCI affiliate, such as Biscayne Uruguay, typically acted as the underwriter or dealer for the SPV offering and received a fee for placing the Preferred Debt. As a result, a BCI client whose funds were invested in a Preferred SPV would functionally pay BCI or its affiliate an underwriting fee in addition to a regular management fee.

24.     The income streams from these fees were re-invested in BCI, which used the money in part to recruit established financial advisors such as Fernando Haberer Bergson ("Haberer"), to expand their scheme. As new advisors brought their clients and relationships under the BCI umbrella, they began to direct clients' funds into the BCI scheme.

25.     In the earlier years of the scheme, the Preferred SPVs would usually channel at least a portion of investor money to South Bay, which was owned by RG Cortes and Weisson. In addition to holding real estate, South Bay was the majority beneficial owner of BCI alongside other minority owners, JC Cortes, and another BCI investment adviser, Frank Chatburn ("Chatburn").

26.     As a holding company of BCI and other Biscayne entities, South Bay provided millions of dollars in capital contributions to BCI to pay advisors and maintain its appearance as a sophisticated investment advisory firm. In this circular scheme, the BCI Principals used BCI to steer their clients' funds into the Preferred SPVs (collecting fees for BCI along the way), and the Preferred SPVs would then fund South Bay, which in addition to funding real estate development, funded BCI. The portion of client funds not used for South Bay went to maintain the scheme— funding pet projects and loans for the BCI Principals and payments back to clients on the Preferred Debt they had been issued by the Preferred SPVs. Thus, BCI client funds were charged fees that lined the pockets of their investment advisors and the BCI Principals, and the remaining client funds were used to prop up South Bay and make scheduled payments on the Preferred Debt.

27.     As a U.S.-registered investment advisor, BCI should, at a minimum, have disclosed to clients the common beneficial ownership and control between South Bay, BCI, and the Preferred SPVs. To continue their ability to misappropriate client funds and to use them for South Bay and BCI unhindered, the BCI Principals instead were careful to suppress any disclosure of these conflicts of interest, and they engaged in a practice of concealment and deception that intensified as the global economic conditions deteriorated in late 2008.

7

**5.** **The BCI Principals Double Down On the Scheme**

28.     By 2009, the combination of the global financial crisis, disruption of the South Florida real estate market, and development delays with the resort left South Bay in a highly vulnerable financial condition. Instead of admitting to clients and investors that they had lost a significant amount of money on their real estate investments—or that they were wrongfully misappropriating funds along the way—the BCI Principals doubled down on the fraudulent scheme. Around the same time, the financial crisis helped BCI recruit financial advisors that were displaced from larger, institutional investment firms. Several of these new BCI financial advisors began to allocate client funds to the Preferred SPVs.

29.     As BCI added financial advisors and increased its access to capital, the BCI Principals formed more entities and made new and secondary offerings of Preferred Debt. BCI financial advisors placed client funds in these offerings, with the proceeds used to make scheduled payments to legacy investors, thereby covering the BCI Principals' failures and perpetuating the scheme. The Preferred SPVs that offered debt include:

- Sentinel Investment Fund Ltd., a Cayman investment fund ("Sentinel"),

- SG Strategic Income Ltd., a Cayman investment fund ("SGS"),

- Diversified Real Estate Development Ltd. ("Diversified")[1],

- GMS Global Step Up Note, Ltd., a Cayman investment fund ("GMS"), and

- Preferred Income Collateralized Interest Ltd. ("PICI").

In addition, the BCI Principals set up Spyglass Investment Management Ltd. ("Spyglass") to serve as the designated investment advisor for each of the above Preferred SPVs. Each of these entities—BCI, Spyglass, Sentinel, SGS, ORC/Diversified, GMS, and PICI (together with other Preferred

---

[1] Diversified was previously named ORC Senior Secured Limited ("ORC").

SPVs, South Bay, BCI, and the other investment affiliates founded by the BCI Principals, the "Biscayne Group of Companies")—was integral to the BCI Principals' scheme to conceal South Bay's failed investments and their own misappropriations.

30.     The BCI Principals and various BCI and Spyglass representatives continued to direct investors to invest in the Preferred SPVs, which in turn transferred money to South Bay to allow it to conceal its financial difficulties by paying interest payments or repaying old investors who requested redemptions or withdrawals. New money was continually raised to conceal failure and to facilitate ongoing misappropriation. New investors were not told that their money was going towards a scheme to conceal a massive real estate investment failure or to fund ongoing misappropriations by the BCI Principals. Rather, investors and clients of the financial advisors thought they were investing in a real project with prospects of success, enabling the scheme to last for a lengthy period.

31.     Although the original real estate development failed in the 2007-2008 timeframe, new funds and offerings were established in 2008, 2010, 2011, 2012, 2015, etc., as new vehicles were needed to raise more and more money.

**6.      Deutsche Serves a Key Role in the Fraudulent Scheme By Facilitating Offerings and Providing Agency Services on the Preferred Debt**

32.     The BCI Principals' scheme required that the Preferred SPVs make offerings of Preferred Debt that could be placed with clients by the BCI Principals and BCI-affiliated financial advisors. Each such offering was documented in an offering memorandum, which purported to contain the key disclosures about the offering to prospective investors. These disclosures included background on the Preferred SPV, such as the place of formation, its directors, as well as information about the offering, such as the use of proceeds, interest payable, repayment schedule, and fees.

33.     The offering memoranda also disclosed the roles of key third parties that facilitated the offering and administration of the Preferred Debt.  For example, the BCI-affiliate Biscayne Uruguay was typically designated as "Dealer and Calculation Agent," using its network of financial advisors to direct clients and client funds to subscribe to the offering. The BCI Principals also needed a well-known, unaffiliated third-party bank to facilitate the offering of standardized notes by performing various tasks associated with the Preferred Debt in an offering.

34.     The BCI Principals caused the Preferred SPVs to enlist Deutsche to perform these tasks for virtually all of the Preferred SPVs' offerings. As a result, the offering memoranda generally designated Deutsche as the Issuing Agent, Principal Paying Agent, and Transfer Agent.

35.     In these roles, Deutsche performed the day-to-day functions necessary to take in investor funds, track ownership of Preferred Debt, and administer payments to holders of the Preferred Debt.

36.     As Issuing Agent, Deutsche distributed the certificates issued by the Preferred SPVs and collected the certificate purchase price from investors.

37.     As Principal Paying Agent, Deutsche was responsible for making the periodic coupon payments from the Preferred SPVs to investors.

38.     As Transfer Agent, Deutsche handled other tasks such as recording transactions and delivering communications from the Preferred SPVs to investors.

39.     As Registrar, one of Deutsche's affiliates created and maintained records tracking the Preferred SPVs' certificate holders.

40.     Deutsche needed to communicate and coordinate closely with the BCI Principals and several key personnel that worked for them so it could fulfill its various agency responsibilities. The Agency Agreement for PICI provides several specific examples why these

tasks required such extensive interaction with the BCI Principals. It required Deutsche to, among other responsibilities, "keep a full and complete record of all Notes and Coupons…and of their redemption, purchase, cancellation, or payment," and to share those records with the issuer, to arrange for the delivery of PICI's notices to investors, and to make all the payments owed by PICI to its investors. The Agency Agreement even authorized Deutsche to make necessary payments out of its own pocket and obtain reimbursement from PICI.

41.     In addition, the BCI Principals worked closely with Deutsche in preparation for new offerings of Preferred Debt. Deutsche received advance copies of the Preferred SPVs' offering documents, reviewed the contents, and often provided comments.

42.     For example, Deutsche served as the paying agent, and one of its affiliates as registrar, for notes issued by the Preferred SPV, ORC, under the name ORC Senior Secured Limited Series II. In August 2013, Deutsche collaborated with the BCI Principals on the ORC Senior Secured Limited Series II offering memorandum (the "ORC II Memorandum"), reviewing drafts and offering comments and proposed revisions.

43.     In its "Conflicts of Interest" section, the ORC II Memorandum disclosed that ORC was owned entirely by a holding company that was wholly owned by the BCI Principals. The ORC II Memorandum also disclosed that ORC would invest primarily in South Bay, and that South Bay was partially owned by the same individuals. Many of the same conflicts were described in other offering memoranda that Deutsche received, including the offering memoranda for the June 2012 offering for SGS, the 2013 offering for PICI, and the 2014 offering for GMS. Deutsche had also received a second, January 2011 memorandum for PICI that did *not* disclose any conflicts of interest—an omission that Deutsche apparently ignored.

44.     In its "Risk Factors" section, the GMS memorandum also described the circular nature of GMS's business plan. It stated that if the GMS offering did not raise enough capital to complete all of South Bay's real estate developments, that South Bay would be unable to pay back its obligations to GMS unless it raised more money from the Preferred SPVs, including GMS itself. In other words, South Bay would have to borrow more money *from* GMS in order to avoid defaulting on the GMS notes.

45.     Deutsche would ultimately learn from a May 2016 SEC Cease-and-Desist Order (described below) that the problematic conflicts of interest among the Biscayne Group of Companies and the Preferred SPVs, as well as the circular nature of South Bay's business and funding described above, were not disclosed to investors.

### 7.     The BCI Principals Restructure Offshore to Avoid SEC Scrutiny of the Biscayne Group of Companies

46.     In 2012, the SEC initiated an examination of BCI. As a Florida-based US-registered investment advisor, BCI was one of the few Biscayne-related entities within the SEC's oversight and regulatory authority.

47.     In response, the BCI Principals began a restructuring intended to place BCI and their investment activities outside the SEC's jurisdiction and prevent the examination from exposing their ongoing scheme. The BCI Principals formed Biscayne Capital Holdings Ltd. in Bermuda ("BH Bermuda") and, in August 2012, began transferring the assets and operations from BCI to this new entity or one of its subsidiaries. After this restructuring, the assets and operations previously housed at BCI became owned and managed outside the United States.

48.     Further removing their operations from the reach of the SEC, the BCI Principals moved additional investment advisory and brokerage activities from BCI to Biscayne Uruguay

and worked with Haberer's contacts at Deutsche to open custody accounts with Deutsche for Biscayne Uruguay.

49.     Following its examination, the SEC launched a formal investigation in 2014 into the suspicious activities of BCI, the BCI Principals, and several of the Preferred SPVs. This led the BCI Principals to restructure the vehicles through which they operated their scheme and to begin moving their assets through various foreign entities to further protect against potential SEC enforcement.

### 8.     The BCI Principals Create Madison Amidst the SEC's Inquiry into BCI's Activities

50.     The BCI Principals' most significant effort in circumventing SEC enforcement was to form and move operations to Madison, a new entity domiciled in the Cayman Islands outside the reach of U.S. regulators. Initially owned by Rueda, the father of JC Cortes and RG Cortes, Madison was formed to serve as a clearinghouse for settling securities transactions and cash transfers necessary to maintain the BCI Principals' scheme. Externally, Madison was presented as an entity that was similar to BCI and later Biscayne Uruguay—*i.e.*, a financial services company that provided advice to the Ibero-American markets and served as a broker and investment advisor for the Biscayne Group of Companies.

### 9.     Madison Opens Accounts with Deutsche

51.     Shortly after forming Madison, Haberer and the BCI Principals tapped Gustavo Trujillo ("Trujillo") to manage its operations. A long-standing confederate of the BCI Principals, Trujillo had started working for the Cortes family in the operations department of their insurance company when he was 21 years old. Despite having no professional degree or other credentials qualifying him to work in insurance or investment administration, over time Trujillo became a trusted figure in the Cortes family's business dealings and was eventually elevated to manage the

back office operations of BCI and Biscayne Uruguay. Haberer and the BCI Principals turned to Trujillo to manage Madison in connection with their plan to move additional back office investment, brokerage, and custody activity for the Preferred SPVs to Madison.

52.     The BCI Principals worked with Haberer and Trujillo to expand Deutsche's role in the scheme by having Deutsche serve as Madison's primary custody banking partner. Haberer and the BCI Principals had developed a close working relationship with Deutsche through Deutsche's agency work for the Preferred SPVs, and, through Biscayne Uruguay, had established the group as a client of Deutsche's custody banking services.

53.     In early late 2013 and early 2014, Haberer and Trujillo had discussions with Floris Vreedenburgh ("Vreedenburgh"), one of their closest contacts at Deutsche who worked out of its New York branch, about extending Deutsche's custody and banking services to Madison. On February 27, 2014, Vreedenburgh travelled from New York to South America to follow up on these discussions and meet with Haberer and his team in person.

54.     On information and belief, at the meeting, Haberer shared with Vreedenburgh their plan to have Madison serve as the primary investment advisor and broker for the Preferred SPVs and other affiliates of the BCI Principals. As reflected in contemporaneous emails, Vreedenburgh explained that Deutsche would allow Madison to set up a primary custody account for Madison, as Deutsche had done for Biscayne Uruguay, and Madison could then establish separate custody subaccounts for the Preferred SPVs and its other "clients." Vreedenburgh also explained that Deutsche would need to perform its own due diligence on any third parties for whom Madison sought to set up custody accounts.

55.     But at this point, the prospect of Deutsche performing due diligence on the Preferred SPVs and affiliates of the Biscayne Group of Companies posed little risk to the BCI

Principals and Haberer, as Deutsche already knew about all the elements of the scheme. Deutsche knew that Madison was an extension of the Biscayne Group of Companies and had no issue continuing to provide ongoing agency services for the Preferred SPVs. These agency services had provided Deutsche with access to virtually all the pertinent information about the Preferred SPVs, yet Deutsche had never raised any concerns with the Preferred SPV offerings or with the conflict disclosures in the offering memoranda that it had received and reviewed. In addition, Deutsche was still providing custodian services for Biscayne Uruguay, and Deutsche had never raised concerns about performing this work given the disclosed conflicts among the Biscayne Group of Companies. Deutsche personnel had close working relationships with several principals of the Biscayne Group of Companies, including Haberer, Trujillo, RC Cortes, and JC Cortes. Deutsche's invitation to expand its relationship and custodian work to Madison indicated that Deutsche was content to continue collecting fees and playing its role in the BCI Principals' scheme.

56.     On March 3, 2014, Trujillo confirmed these discussions in writing, emailing Vreedenburgh in New York to ask Deutsche to open a custody account for Madison and "establish a new relationship with one of the entities related to Biscaynes group." Vreedenburgh responded that Deutsche was "looking forward to expanding our collaboration on the custody front," and told Trujillo that Deutsche could establish custody accounts with an unusually low minimum monthly fee "given these accounts are incremental business with an existing relationship." Vreedenburgh proposed that the "fee arrangements currently in place for Biscayne" apply to the Madison custody account.

57.     Soon afterwards, Deutsche's New York Branch and Madison executed a Multi Market Custody Agreement (the "Custody Agreement," attached as Exhibit A), dated March 7, 2014, together with an E-Mail Addendum (the "Addendum," attached as Exhibit B) executed as

of the same date. Rueda signed the Custody Agreement on behalf of Madison, and provided Deutsche with a copy of Madison's management structure, which listed himself as the "Director – Shareholder," Haberer as the "General Manager," and Trujillo as the "Operations Manager."

58.     Under the Custody Agreement, Deutsche's New York branch set up a primary custody account in the name of Madison along with subaccounts for each of the Preferred SPVs. In total, Deutsche set up at least thirty (30) custody subaccounts for various Preferred SPVs and other entities within the Biscayne Group of Companies that Madison managed. *See* Account List, Exhibit C.

59.     The offering memoranda for many (if not all) of the Preferred SPVs listed their material contracts and third-party service relationships, but made no reference to the Preferred SPVs using Madison and its custody accounts at Deutsche. Despite having reviewed these offering memoranda, Deutsche did not object to setting up custody arrangement with Madison that had not been disclosed to the Preferred SPVs' investors.

60.     Due in part to Deutsche's multifaceted relationship with the Biscayne Group of Companies and their principals, Deutsche opened the Madison custody account and subaccounts without following industry-standard know-your-customer procedures.

61.     For example, it was not until after the subaccounts were opened that Deutsche made a perfunctory request for documentation from Madison showing the underlying beneficial ownership for each of the entities with a Madison-managed subaccount with Deutsche. Still, Deutsche clearly knew at the time the accounts were opened that Madison and its principals were closely related to the Biscayne Group of Companies. Among other things, Deutsche had received and reviewed offering memoranda that disclosed the ownership of several of the Preferred SPVs. Moreover, the request to open accounts for Madison was reflected in a series of emails from

Trujillo that: (1) describe Trujillo as still serving as the Vice President of "Operations and Trading" for one of the Biscayne Group of Companies; (2) note that Madison was an entity "related to the Biscaynes [sic] group"; and (3) state that Rueda, Madison's shareholder, was also "a director and shareholder in BiscayneCapital."

62.      Nonetheless, in response to Deutsche's request, on or around July 20, 2015, Trujillo disclosed the following to Deutsche:

**Table 1 – Subaccount Ownership Disclosures**

| Account | Disclosed owners as of July 2015 |
|---|---|
| 153-05090 █████████ | ████ |
| 153-05091 ██████████ | ███████████████████ |
| 153-05092 ███████████ | ████████████████████ |
| 153-05093 ████████████ | ████████████████████ |
| 153-05094 █████████████ | ████████████████████ |
| 153-05095 ██████████ | ███████████████████ |
| 153-05097 █████████████ | ████████████████████ |
| 153-05098 ████████████ | ███████████████████ |
| 153-05110 ██████ | ███████████████ |
| 153-05111 ████████████ | ████████████████████ |
| 153-05112 ███████████ | ████████████████████ |
| 153-05114 ███████ | ██████████████████ |
| 153-05115 ██████████ | ████████████████████ |

| Account | Disclosed owners as of July 2015 |
|---|---|
| 153-05116 ██████████████ | ████████████████████████ |
| 153-05118 █████████████ | ████████████ |
| 153-05119 ██████████ | ██████████████████████████ |
| 153-05120 ████████████ | ██████████████████████████ |

63.     Over time, hundreds of large cash transfers were made through Madison's primary custody account and these subaccounts with Deutsche, all of which were held in Madison's name. Deutsche's lax oversight associated with the opening of the custody accounts carried over to a reckless failure of oversight with respect to the use of those accounts.

**10.     Trujillo Becomes Madison's Beneficial Owner and Continues the Scheme with Deutsche's Assistance**

64.     Toward the end of 2015, the BCI Principals asked Madison's "Operations Manager," Trujillo, to take over Rueda's position and become the beneficial owner and principal of Madison. By this point, Trujillo had worked with RG Cortes and Rueda for almost 15 years and was a central figure in Madison's operations.

65.     Trujillo agreed to replace Rueda as the beneficial owner of Madison and to oversee Madison's operations under the direction of the BCI Principals.

66.     As directed by Haberer and the BCI Principals, Trujillo continued using Madison to direct transfers and to carry out the scheme to conceal the investment failure and the misappropriations of the BCI Principals.

67.     Serving as both Madison's custody bank and in various agency roles for the Preferred SPVs, Deutsche's wide-ranging role facilitating the scheme went well beyond processing cash transfers and administering the custody accounts. For example, Deutsche kept

track of the amount of debt that each Preferred SPV was authorized to issue, as well as the amount actually issued. In March 2014, Deutsche observed that the Preferred SPV GMS had issued more debt than was authorized by its offering documents and raised the issue with Trujillo. Deutsche proposed a solution to this problem and advised Trujillo on the documents that GMS needed to amend to conform the documents to the amounts actually borrowed. Once GMS and several other Preferred SPVs' documents were amended to allow them issue more debt, Deutsche offered to draft Trujillo's email to the external clearinghouses that facilitated the trading of GMS's debt, informing them about the new terms governing the Preferred SPVs and ensuring that the BCI Principals could continue to execute trades without interruption.

68.     Deutsche also helped Trujillo and the BCI Principals extend the maturity of the Preferred Debt to delay repayments to investor clients. In October 2014, Trujillo emailed Deutsche's representative, Paul Yetton, to ask how to extend the maturity date of the PICI notes. Yetton responded that Trujillo would first need to get note holder approval, then submit blacklined versions of the documents to Deutsche. When Trujillo asked about the process for getting approval from the note holders, Yetton advised Trujillo that he may need to convene a noteholder meeting and sent Trujillo the agency agreement and offering memoranda for PICI.

69.     Years later, Trujillo was charged with—and pleaded guilty to—wire fraud and money laundering for his many years-long role in the sale of investments tied to the real estate development through the Biscayne Group of Companies. *See* Trujillo Criminal Information, <u>Exhibit D</u>. Documents in Trujillo's criminal proceedings revealed further details that showed how Madison was used as a vehicle to continue carrying out the fraudulent scheme.

70.     According to the charging document, throughout 2015 and 2016, Trujillo executed the sale of investments "knowing that the real estate projects purportedly funded by the Cayman

Islands Funds were insolvent and had no reasonable prospect of generating returns." And he created false and fraudulent bank statements that purported to show that clients' funds were "safely invested in the Cayman Islands Funds." In addition, Trujillo made purported interest payments to clients "to deceive them into believing that their investments were generating returns, when in fact their money was not invested in real estate and was not generating returns."

71.    Trujillo also allowed Madison accounts to be used for corrupt payments to government officials. For example, Madison's accounts were used to disguise bribes for a client who rigged a bid for a contract with PetroEcuador. In furtherance of this scheme, Trujillo facilitated a transfer into the Madison accounts with Deutsche of approximately $2.9 million in contract proceeds from PetroEcuador and then he "wired and caused to be wired at least $2.3 million" from the accounts "to repay certain…clients and other debts."

72.    Trujillo orchestrated numerous other fraudulent transfers using Madison's accounts at Deutsche in 2015 and 2016. Deutsche never attempted to stop these transfers, despite having access to the details of all transfers between and among the Biscayne Group of Companies and the BCI Principals through the Madison accounts. Moreover, given that Deutsche was compensated per transaction on top of its fees for agency services, Deutsche benefitted from maintaining Madison's fraudulent business, which involved transfers that were both unusually high in volume and demonstrably suspicious upon even a cursory review.

73.    Deutsche had good reason to believe that the transfers discussed above (and others) were not legitimate, as they were clearly inconsistent with of the use of proceeds disclosed in the offering memoranda that Deutsche had received and reviewed. For example, the offering memoranda for the SGS Series 2014, Series 2016, and Series 2018 offerings—provided to

Deutsche around the time that Madison established custody accounts with Deutsche—each stated that:

> The Issuer [SGS] shall apply all proceeds from the issuance of Notes (less the Sales Charge) to apply for interests in the Referenced Entity [South Bay].

Despite this clear restriction on capital raised, Madison's SGS subaccount at Deutsche showed

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████

### 11. **SEC Publishes a Consent Order Detailing the BCI Principals' Violations of Federal Securities Laws and Imposes Sanctions Against Madison's U.S.-Counterpart, BCI**

74.     After a lengthy inquiry into the Biscayne Group of Companies, the SEC entered and published a consent order dated May 26, 2016, in which the Commission detailed its findings that BCI, the BCI Principals—including RG Cortes, Weisson and JC Cortes—together with Chatburn committed multiple violations of the federal securities laws. *See* SEC Order, <u>Exhibit E</u>. In the order, the Commission found, *inter alia*, that the common beneficial ownership and effective control of BCI, certain Preferred SPVs, and South Bay created multiple conflicts of interest for BCI that should have been disclosed when BCI and the BCI Principals recommended and sold shares issued by the Preferred SPVs to BCI's clients. The Commission also found that:

(1)     South Bay's calamitous financial condition from 2010 through 2012—together with BCI's dependence on South Bay for financial support during this time and BCI's ownership by related parties—created multiple conflicts of interest that should have been, but were not, disclosed to investors;

(2) RG Cortes and JC Cortes wilfully aided and abetted and caused BCI to make material misrepresentations about BCI and certain of the Preferred SPVs; and

(3) BCI failed to disclose material information concerning South Bay's financial condition, including that South Bay failed to generate enough revenue or operating cash flow to meet maturing debt, or sustain operations absent new funds generated by the issuance of new Preferred Debt, and as a result, had to renegotiate past-due debt.

75.     The Commission found that none of these conflicts nor South Bay's financial condition were disclosed to BCI clients, nor did BCI and the BCI Principals correct the misrepresentations. The Commission further determined that these failures constituted wilful violations of Sections 206 and 207 of the Advisers Act, and as such, operated as fraud and deceit on BCI's investors. Deutsche, of course, was already aware of these conflicts and South Bay's dependence on circular and recurrent funding because, among other reasons, it possessed and reviewed versions of the Preferred SPVs' offering memoranda that had supposedly been provided to clients and disclosed the conflicts and South Bay's financing.

76.     Because offering memoranda contain the key disclosures that are supposed to be made to prospective investors, the SEC's conclusion that the offerings of Preferred SPVs had material misrepresentations and omissions when raising investor funds should have set off alarms for Deutsche. Deutsche's agency services had helped the Preferred SPVs raise these investor funds and administer the investment, yet critically important disclosures were not made to investors. Deutsche's ongoing role as the custody bank for Madison was facilitating the purported management of these funds—funds that the SEC Order indicated were raised without disclosure to investors and under circumstances that operated as "a fraud or deceit upon…client(s) or prospective client(s)." At a minimum, the publication of the SEC Order should have prompted

Deutsche to immediately conduct further inquiries into the activities it was facilitating by serving as agent and custody bank for the Preferred SPVs.

77.     The Commission's finding that the Biscayne Group of Companies did not disclose conflicts of interest to investors indicated that investors did not receive the Preferred SPV offering memoranda (or, at least, the same versions) that Deutsche possessed and reviewed. Investors had apparently not been told that South Bay was reliant on new debt from the Preferred SPVs to pay existing obligations—a fact that Deutsche knew based on its participation in reviewing and helping to prepare the content of several of the Preferred SPVs' offering memoranda.

78.     As a result of its findings, the Commission imposed both monetary penalties and sanctions on BCI, the BCI Principals, and Chatburn, including that each "cease and desist from committing or causing any violations and any future violations" of Sections 206 and 207 of the Advisers Act. The BCI Principals and Chatburn were also "barred from association with any broker, dealer, investment adviser [or] transfer agent" and "prohibited from serving or acting" in a role for a registered investment company for a minimum of three years. The Commission further assessed disgorgement and civil money penalties against BCI, the BCI Principals, and Chatburn.

79.     Faced with these facts, Deutsche should have immediately halted the services that enabled Madison to serve as a broker dealer and investment advisor within the Biscayne Group of Companies, as it knew that the BCI Principals were still associated with Madison in contravention of the SEC Order. Deutsche should have also stopped payment and agency activity associated with the Preferred SPVs until it could determine that, going forward, the trading and transfer activity associated with those entities complied with the SEC Order and securities laws. Further, Deutsche should have notified Trujillo or the BCI Principals that until such compliance could be assured,

Deutsche would not resume providing services for Madison. Deutsche, however, knowingly failed to take any of these steps.

### 12.    Deutsche Closes Some Biscayne Group of Companies' Accounts in Response to SEC Order, But Allows Others—like Madison's—to Stay Open

80.      Following publication of the SEC Cease-and-Desist Order, Deutsche closed a limited set of accounts held by affiliates of the Biscayne Group of Companies. Deutsche apparently reviewed other related accounts that it had opened for the Biscayne Group of Companies, such as those with Madison and Biscayne Uruguay, but allowed them to stay open. Deutsche's decision to turn a blind eye to Madison's accounts was no accident or oversight given that Deutsche had begun an internal inquiry into the Biscayne Group of Companies' accounts *before* the entry of the SEC Order. Indeed, in January 2016—four months before the SEC Order was published—Deutsche had expressed concern with the number of wires, unusual activity, and the hundreds of purported beneficiaries for Madison and Biscayne Bahamas. And in February 2016, Deutsche notified Trujillo that Deutsche's risk and compliance group had flagged this issue, and it could no longer process wires from custody subaccounts that were unrelated to Madison's and Biscayne's custody securities activity. Many of these concerns should have been self-evident to Deutsche based on information it had in its possession for years.

81.      Yet the issue persisted and, on May 17, 2016, Deutsche's risk and compliance group identified more improper wire transactions, such as the use of a custody account for one of the Preferred SPVs to pay an American Express bill. Scott Habura—Deutsche's New York-based head of US custody accounts and lead with respect to Madison's custody relationship with Deutsche—emailed Trujillo to tell him to re-direct "third party wires to an outside cash account" which helped Trujillo understand how to bypass these restrictions and continue the scheme.

82.     Moreover, in early May 2016, again, before the SEC Order was entered, Deutsche requested files for South Bay in connection with a "periodic review." The files Deutsche requested included items that it had previously failed to obtain, such as South Bay's memorandum of association, its most recent shareholder registrar, and a list of its directors. When it made this request, Deutsche already knew who the owners of the Biscayne Group of Companies were, including the owners of South Bay and PICI. Thus, by the time of the entry of the SEC Order, Deutsche was fully aware that the individuals who had wilfully violated securities laws according to the SEC Order ████████████████████████████████ were among the owners, managers, and financial operators of the entities associated with Madison's managed subaccounts.

83.     The SEC Order made it impossible for Deutsche to ignore what it already knew—that the BCI Principals, Madison, and the Biscayne Group of Companies had severe conflicts of interest. It also made Deutsche unable to continue to ignore that the BCI Principals: (1) had failed to disclose those conflicts of interests to clients and investors in Preferred SPVs; (2) had made key omissions and misrepresentations about the ownership, operating history, and financial performance and prospects of certain Preferred SPVs; and (3) had used the Preferred SPVs to fund a failing enterprise without full disclosure to clients and investors. Deutsche further knew that, through the custody account and subaccounts it maintained for Madison, it was continuing to be a key participant in the scheme by making questionable transfers by and among the Biscayne Group of Companies, the BCI Principals, and related entities.

84.     Despite failing to obtain all requested documentation for related entities, learning of the securities violations in the SEC Order, knowing Madison's accounts were owned or managed (directly or indirectly) by the subjects of the SEC Order, recognizing it was continuing to provide normal agency services to the Preferred SPVs, and closing just a limited set of accounts

based on information in the SEC Order while letting others to remain open, Deutsche took no action to stop the scheme. Deutsche's wrongful conduct was not a mere failure to act. Rather, Deutsche facilitated the processing of tens of millions in additional transfers and maintained all the custody accounts and subaccounts enabling repeated and excessive improper activity, including subaccounts for the Biscayne Group of Companies referenced in the SEC Order.

### 13.   Deutsche Requests, But Does Not Receive, KYC and AML Documentation for Madison-Managed Entities

85.   After the SEC Order, Deutsche compliance and anti-money laundering personnel made additional requests to Trujillo for information on the Madison-managed entities and related account activity. These requests included the latest available financials and documentation showing the ownership structure for different Madison-managed entities in November 2016, January 2017, and June 2017. At each juncture, representatives for the Madison-managed entities either did not respond, stalled and made excuses, or sent incomplete information such that Deutsche's information requests remained outstanding for several months.

86.   After certain early-June requests for updated documentation, on June 15, 2017, Deutsche's New York branch finally provided notice to Madison that it was terminating the Custody Agreement effective August 31, 2017, and closing Madison's cash and custody accounts "[a]s soon as practicable" after the termination date. *See* Deutsche Bank Termination of Custodian Services, Exhibit F. But by the time of the termination notice, irreversible damage had been done because Deutsche had allowed the Madison account and sub-accounts to be used for many millions of dollars of fraudulent transactions.

### B.   DAMAGES/TRANSACTION ANALYSIS

87.   The Custody Agreement contemplated that the custody account and subaccounts would be used to hold and transfer cash to facilitate trading and settlement activity associated with

Madison's purported broker and investment advisory services. Activity in the subaccounts would, therefore, be expected to be limited to two types of cash transfers: (1) transfers with bank accounts owned by Madison or the funds it managed; and (2) transfers with trading counterparties. Instead, cash was regularly transferred between and among the various Madison accounts and for purposes unrelated to Madison's supposed services as an investment advisor and asset manager. Given Deutsche's extensive involvement and interaction with the BCI Principals, and its multi-faceted roles, there were at least four different types of cash transfer activity that was atypical for managed custody accounts, and either inconsistent with the Custody Agreement or contrary to the offering memoranda.

88.    *First*, there were regular and sizable direct cash transfers to personal accounts held either by BCI Principals directly or by entities clearly associated with BCI Principals' personal interests. For example, during 2015 and 2016, Madison subaccounts for ███████████████████ ███ made over $1 million in total direct transfers to the personal accounts for the BCI Principals. These transfers have no apparent investment-related purpose that would be appropriate for Madison's custody investment accounts and should have, at a minimum, raised questions and invited close scrutiny regarding their purpose and legitimacy of Madison's investment subaccount activity.

89.    *Second*, Madison's primary custody account shows several large wire transfers to third parties after May 27, 2016, that had a questionable or tenuous connection to supposed legitimate trading activity. These third parties included entities such as ███████████████ ███, a company controlled by ██████████ Ramiro A. Luque, the owner of Galileo Energy involved in the payment of bribes to obtain and retain Galileo's contracts with PetroEcuador. These types of transfers total over $16 million.

90.     *Third*, there were a series of pass-through transfers from Madison's accounts and subaccounts, where funds were deposited in one subaccount and the same funds were immediately transferred to another subaccount before being transferred to an outside account. From 2015 to 2016, these pass-through transfers included transfers from ███████████ totaling almost $5 million and from ██████████ totaling over $5.7 million.

91.     *Fourth*, after the SEC Order publicly revealed that Madison and its principals were using Madison's accounts to facilitate fraudulent financial activity, Deutsche continued to allow millions of transfers—over $164 million—to flow through Madison's primary custody account. Although the BCI Principals mixed legitimate transfers with illegitimate transfers, scores of large transfers were made in furtherance of the BCI Principals' fraud, using new investor dollars to repay legacy investors alongside misappropriating funds to the BCI Principals and their affiliates. Millions of dollars were transferred for improper and corrupt purposes to Madison-managed entities and related parties of the BCI Principals.

92.     In total, Madison suffered losses of over $60 million from fraudulent trading activity and transfers that misappropriated funds and has received more than $200 million in liquidation claims resulting from the carrying on of its business in a fraudulent manner to which Deutsche was a knowing participant.

## COUNT ONE: FRAUDULENT TRADING
(Cayman Islands Companies Law § 147)

93.     Plaintiffs repeat and re-allege all of the allegations set forth in the preceding paragraphs of the Complaint as if fully set forth herein.

94.     Trujillo managed Madison with the intent to defraud its creditors and engage in fraudulent trading activity at the direction of the BCI Principals and Haberer. In particular, Trujillo:

(1) executed the sales of investments knowing that the real estate projects purportedly being funded were insolvent and had no reasonable prospect of generating returns; (2) created false and fraudulent bank statements to show that the clients' funds were safely invested in the various funds; and (3) made purported interest payments to clients so the clients would believe that their investments were generating returns when, in fact, they were not.

95.     Deutsche knowingly was a party to the carrying on of Madison's fraudulent business. As set forth above, Deutsche facilitated the transfers from Madison and substantially assisted Trujillo in his actions taken with an intent to defraud Madison's creditors and with fraudulent purposes. As described, Deutsche knew, among other things, that: (1) the Madison custody accounts were not being used as contemplated by the Custody Agreement; (2) the funds in the Madison custody accounts were not used in a manner consistent with the offering memoranda; (3) of the Madison accounts and subaccounts for which it had information, the owners and managers were ultimately (either directly or indirectly) █████████████████████ ███████; (4) the SEC issued a Cease-and-Desist consent order to RG Cortes, Weisson, and JC Cortes for wilful violations of U.S. Securities laws and placed those individuals under sanctions that barred them from association with any broker, dealer, investment advisor, or transfer agent; and (5) RG Cortes, Weisson, and JC Cortes were using the Biscayne Group of Companies to fund a failing enterprise, and that the funds to do so were obtained from investors through deceit, misrepresentations and omissions. Yet, Deutsche continued to process transfers among the Biscayne Group of Companies alongside other outgoing transfers from Madison's custody accounts, including subaccounts for entities named in the SEC Order.

96.     Pursuant to Section 147 of the Cayman Islands Companies Law (2012 Revision, as amended), the court may declare that Deutsche is "liable to make such contributions" to Madison

"as the Court thinks proper." Deutsche was a knowing participant in the fraudulent trading scheme perpetrated at Madison that facilitated transfers made with the intent to defraud the Madison's creditors and to carry on Madison's business with a fraudulent purpose by using cash from its accounts held at Deutsche for misappropriations and to perpetuate a fraudulent scheme. As a result, Deutsche should be required to make a contribution to Madison in an amount equal to the loss that it suffered through the carrying on of its business in a fraudulent manner, at least $200 million.

## V.   NOTICE OF INTENT TO RAISE ISSUES UNDER FOREIGN LAW

97.     Pursuant to Rule 44.1 of the Federal Rules of Civil Procedure, the JOLs hereby give notice of their intent to raise issues under Cayman Islands law, including but not limited to, their claim for Madison carrying their business with the intent to defraud creditors with a fraudulent purpose pursuant to Section 147 of Cayman Companies Law. The JOLs intend to offer expert testimony, documents, and other relevant material or sources to the Court to determine the foreign law at issue.

## VI.   JURY DEMAND

98.     Plaintiffs demand a jury trial on all contested issues of fact.

## VII.   RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that a judgment be entered on their behalf against Defendant for the following:

a.   A contribution to Madison pursuant to Section 147 of the Cayman Islands Companies Law;

b.   Pre-judgment and post-judgment interest at the highest rate allowed by law; and

c.   Any and all such further relief to which Plaintiffs are entitled at law and in equity.

Dated: January 29, 2021
New York, New York

                         **REID COLLINS & TSAI LLP**

                         /s/ *Jeffrey E. Gross*
                         Jeffrey E. Gross
                         P. Jason Collins
                         Vincenzo Novelli
                         330 West 58th Street, Suite 403
                         New York, NY 10019
                         Tel.: 212.344.5200
                         jgross@reidcollins.com
                         jcollins@reidcollins.com
                         vnovelli@reidcollins.com

                         Jordan L. Vimont, Sr. (*pro hac vice*)
                         1301 S. Capital of Texas Hwy
                         Building C, Suite 300
                         Austin, Texas 78746
                         Tel.: 512.647.6100
                         jvimont@reidcollins.com

                         *Counsel to Plaintiffs*