REID COLLINS & TSAI LLP
Jeffrey E. Gross
P. Jason Collins
Vincenzo Novelli
330 West 58th Street, Suite 403
New York, NY 10019
Tel.:  212.344.5200

Jordan L. Vimont, Sr. (*pro hac vice*)
1301 S. Capital of Texas Hwy
Building C, Suite 300
Austin, Texas 78746
Tel.:  512.647.6100

*Counsel to Joint Official Liquidators of Madison Asset LLC*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARTIN NICHOLAS JOHN TROTT and CHRISTOPHER JAMES SMITH, on behalf of and solely in their capacity as the Foreign Representatives and Joint Official Liquidators of MADISON ASSET LLC (IN LIQUIDATION),<br><br>　　　　　　　Plaintiffs,<br><br>　　v.<br><br>DEUTSCHE BANK AG,<br><br>　　　　　　　Defendant. | Case No. 1:20-cv-10299-MKV |

## <u>SECOND AMENDED COMPLAINT</u>

Plaintiffs Martin Nicholas John Trott and Christopher James Smith ("<u>Plaintiffs</u>" or the

"<u>JOLs</u>"), solely in their capacity as the Foreign Representatives and Joint Official Liquidators of

Madison Asset LLC ("<u>Madison</u>"), a Cayman investment fund that is now in official liquidation

proceedings before the Grand Court of the Cayman Islands, bring claims against Deutsche Bank

AG ("<u>Deutsche</u>" or "<u>Defendant</u>") for fraudulent trading under § 147 of the Cayman Islands

Companies Act (2021 Revision, as amended), and respectfully allege as follows:

## I.    __INTRODUCTION__

1.      The JOLs, on behalf of Madison, bring this case against Deutsche for its role in aiding a fraudulent trading scheme orchestrated by Madison's former principals and principals of related entities between 2014 and 2017 that caused Madison to suffer more than $200 million in damages. As Madison's bank for custody accounts and as the Issuing Agent, Principal Paying Agent, and Transfer Agent for the fraudulent securities at the heart of the fraud, Deutsche knew that Madison's accounts were being used to perpetuate a fraudulent scheme. Deutsche's employees were aware of the conflicts of interest associated with the principals behind the fraud, and their repeated abuse of the Madison account. From the opening of the Madison account in 2014 through the closing of the account, Deutsche's employees, including its employees who managed the customer relationship and several layers of its supervisory employees in its operations area, were aware of the connection between Madison and other accounts operated by its principals. Given that the BCI Principals set up Madison as a clearinghouse for settling securities transactions and cash transfers that were necessary to maintain the BCI Principals' scheme, Deutsche played a pivotal role in carrying out and assisting Madison's fraudulent business.

2.      But instead of halting the scheme and refusing to take part, Deutsche turned a blind eye and several Deutsche bankers actively helped Madison continue to process wrongful transfers, while others utterly failed to follow any modicum of proper procedures or oversight with respect to Madison's accounts. By any estimation, Deutsche played a pivotal role in carrying out and maintaining Madison's fraudulent business by facilitating and processing tens of millions in wrongful cash transfers for purposes that had nothing to do with legitimate securities custody activity.

3.      Deutsche's continued participation in Madison's business in the face of glaring red flags resulted in Madison's accounts being drained of millions of dollars for fraudulent purposes.

## II.    PARTIES

### A.    PLAINTIFFS

4.      The JOLs are the foreign representatives of Madison Asset LLC, an exempted company limited by shares formed on or about January 2, 2014, under the Cayman Islands Companies Act.

5.      On March 12, 2018, Westwood Capital Markets S.A. and Seguros Sucre S.A. (together the "Liquidation Petitioners") presented a petition to the Grand Court of the Cayman Islands (the "Grand Court") requesting that Madison be wound up pursuant to Part V of the Companies Act (2021 Revision).

6.      On July 4, 2018, the Grand Court ordered that Madison be wound up and that Martin Nicholas John Trott of R&H Restructuring (Cayman) Limited (formerly known as RHSW (Cayman) Limited) be appointed as Madison's official liquidator. Shortly thereafter the Grand Court appointed Christopher James Smith of RHSW (Cayman) Limited as a joint official liquidator.

7.      As part of their role, the JOLs sought, and the Grand Court granted, leave to obtain recognition of the Cayman Islands proceedings with the United States Bankruptcy Court.

8.      After receiving the Grand Court's permission, the JOLs instructed United States counsel to file a petition with the United States Bankruptcy Court for the Southern District of New York (the "New York Bankruptcy Court") seeking recognition of the Company's Cayman Islands liquidation proceeding ("Cayman Proceeding") as a foreign main proceeding under Chapter 15 of the United States Bankruptcy Code (the "Bankruptcy Code").

3

9.      On October 16, 2018, the New York Bankruptcy Court granted recognition of the Cayman Proceeding as a foreign main proceeding under Chapter 15 and found that the JOLs had demonstrated that they were Madison's duly authorized foreign representatives, as defined by section 101(24) of the Bankruptcy Code.

10.     In August 2020, the Grand Court granted the JOLs' request for sanction to bring this Action in the Southern District of New York.

**B.    DEUTSCHE**

11.     Deutsche Bank AG is a German global banking and financial services company with a branch at 60 Wall Street, New York, NY.

### III.   JURISDICTION AND VENUE

12.     This Court has jurisdiction over Deutsche pursuant to 28 U.S.C. § 1334(b).

13.     Venue lies in this county pursuant to 28 U.S.C. §§ 1391 & 1409.

### IV.   FACTUAL BACKGROUND

**A.    THE BISCAYNE GROUP OF COMPANIES**

**1.    The Real Estate Development Company**

14.     Roberto G. Cortes ("RG Cortes") and Ernesto H. Weisson ("Weisson") were the founders, principals, and beneficial owners of a now-failed South Florida-based residential real estate development company, South Bay Holdings, LLC ("South Bay").

15.     By training and experience RG Cortes, Weisson, and RG Cortes's brother, Juan C. Cortes ("JC Cortes," collectively, the "BCI Principals") were brokers and investment advisors.

16.     When founded in 1999, South Bay financed its activities primarily through commercial bank loans and investments from friends and family.

17.    In 2006 and 2007, the BCI Principals sought to significantly expand South Bay, including by acquiring 30 lots of high-end resort property in Key Largo, Florida, on which South Bay would build luxury residences.

18.    To expand and pursue its acquisition plans, South Bay needed additional funding. The BCI Principals solicited investments from their business network of wealthy Latin American families and formed Biscayne Capital, their now-defunct group of wealth management and investment advisory companies, to promote investments in South Bay alongside other traditional investments.

19.    Between 2005 and 2008 the BCI Principals formed several "Biscayne Capital" entities to ostensibly offer wealth management services for their network of investors, including Biscayne Capital Holdings, LLC (a Delaware corporation), Biscayne Capital (B.V.I.) Ltd. (incorporated in the British Virgin Islands), and Biscayne Capital, S.A., a broker-dealer in Uruguay ("Biscayne Uruguay").

**2.    The U.S.-Based and Registered Investment Advisor**

20.    In 2008, the BCI Principals continued expanding their network of wealth management firms and created their first U.S.-based and registered investment advisor, Biscayne Capital International, LLC ("BCI"). Despite being headquartered in Miami, Florida, BCI was formed to provide wealth management and investment advisory services primarily to non-U.S. Latin American individuals. RG Cortes served as BCI's CEO and JC Cortes as its Chief Compliance/Operations Officer, with Weisson and RG Cortes and JC Cortes's father, Roberto Cortes Rueda ("Rueda"), serving as board members.

21.    To manage client funds and assets, BCI set up custody arrangements with several banks, including Pershing LLC (Bank of New York Mellon), Deutsche, and Raymond James.

Under these arrangements, the accounts held assets beneficially owned by clients, but BCI as the broker or investment advisor had authority to manage the investments in the account (*i.e.,* buying and selling securities, transferring funds to a client's associated bank account).

### 3.      The Special Purpose Vehicles

22.      As investment advisors to their network of investor clientele, the BCI Principals had the ability to steer client funds into the investments that the BCI Principals preferred. Thus, as South Bay began seeking additional capital to fund expansion plans in 2006 and 2007, the BCI Principals began forming special purpose vehicles (each a "Preferred SPV") that created and offered debt securities that, in turn, funded South Bay and other ventures owned by BCI Principals.

23.      Typically formed under the laws of the Cayman Islands or the British Virgin Islands ("BVI"), each Preferred SPV was beneficially owned or controlled by the BCI Principals. Once formed, the BCI Principals would cause the Preferred SPV to prepare offering memoranda and seek to raise capital by selling debt issued by that Preferred SPV ("Preferred Debt") with the stated purpose of raising funds to invest in South Bay to support its development activities. To attract investors, the Preferred Debt typically promised to pay periodic interest. Many of these investors were wealthy Latin American individuals or pension funds that—to the extent they were informed by their advisors as to how funds were invested—were led to believe that the Preferred Debt was more stable than the investments available in their home countries.

### 4.      The Scheme Begins

24.      In their role as investment advisors and wealth managers, the BCI Principals promoted the Preferred SPVs and steered clients into purchasing the Preferred Debt. On information and belief, the BCI Principals formed entities that issued Preferred Debt starting in July 2010.

25.     BCI had its clients execute an "Asset Management Power Entrusted to a Third Party," which gave BCI the ability to make investment decisions on its clients' behalf. BCI would then invest client funds in Preferred Debt, which was lucrative for BCI, because a BCI affiliate, such as Biscayne Uruguay, typically acted as the underwriter or dealer for the SPV offering and received a fee for placing the Preferred Debt. As a result, a BCI client whose funds were invested in a Preferred SPV would functionally pay BCI or its affiliate an underwriting fee in addition to a regular management fee.

26.     The income streams from these fees were re-invested in BCI, which used the money in part to recruit established financial advisors such as Fernando Haberer Bergson ("Haberer"), to expand their scheme. As new advisors brought their clients and relationships under the BCI umbrella, they began to direct clients' funds into the BCI scheme.

27.     In the earlier years of the scheme, the Preferred SPVs would usually channel at least a portion of investor money to South Bay, which was owned by RG Cortes and Weisson. In addition to holding real estate, South Bay was the majority beneficial owner of BCI alongside other minority owners, JC Cortes, and another BCI investment adviser, Frank Chatburn ("Chatburn").

28.     As a holding company of BCI and other Biscayne entities, South Bay provided millions of dollars in capital contributions to BCI to pay advisors and maintain its appearance as a sophisticated investment advisory firm. In this circular scheme, the BCI Principals used BCI to steer their clients' funds into the Preferred SPVs (collecting fees for BCI along the way), and the Preferred SPVs would then fund South Bay, which in addition to funding real estate development, funded BCI. The portion of client funds not used for South Bay went to maintain the scheme—funding pet projects and loans for the BCI Principals and payments back to clients on the Preferred

Debt they had been issued by the Preferred SPVs. Thus, BCI client funds were charged fees that lined the pockets of their investment advisors and the BCI Principals, and the remaining client funds were used to prop up South Bay and make scheduled payments on the Preferred Debt.

29.     As a U.S.-registered investment advisor, BCI should, at a minimum, have disclosed to clients the common beneficial ownership and control between South Bay, BCI, and the Preferred SPVs. To continue their ability to misappropriate client funds and to use them for South Bay and BCI unhindered, the BCI Principals instead were careful—in the early years of their scheme—to suppress any disclosure of these conflicts of interest, and they engaged in a practice of concealment and deception that intensified as the global economic conditions deteriorated in late 2008. Indeed, many of the "disclosures" in offering memoranda were only seen by the Biscayne financial advisors that were overseeing client funds and were complicit in the scheme. As explained below and given the little risk that disclosure in offering memoranda would expose the scheme, in later years, the BCI Principals openly disclosed at least certain conflicts of interest in documents sent to and reviewed by Deutsche.

### 5.     The BCI Principals Double Down On the Scheme

30.     By 2009, the combination of the global financial crisis, disruption of the South Florida real estate market, and development delays with the resort left South Bay in a highly vulnerable financial condition. Instead of admitting to clients and investors that they had lost a significant amount of money on their real estate investments—or that they were wrongfully misappropriating funds along the way—the BCI Principals doubled down on the fraudulent scheme. Around the same time, the financial crisis helped BCI recruit financial advisors that were displaced from larger, institutional investment firms. Several of these new BCI financial advisors began to allocate client funds to the Preferred SPVs.

31.     As BCI added financial advisors and increased its access to capital, the BCI Principals formed more entities and made new and secondary offerings of Preferred Debt. BCI financial advisors placed client funds in these offerings, with the proceeds used to make scheduled payments to legacy investors, thereby covering the BCI Principals' failures and perpetuating the scheme. The Preferred SPVs that offered debt included, but were not limited to:

- Sentinel Investment Fund SPC, a Cayman investment fund ("Sentinel"),

- SG Strategic Income Ltd., a Cayman investment fund ("SGS"),

- Diversified Real Estate Development Ltd. ("Diversified")[1],

- GMS Global Market Step Up Note Ltd., a Cayman investment fund ("GMS"), and

- Preferred Income Collateralized Interest Ltd. ("PICI").

In addition, the BCI Principals set up Spyglass Investment Management Ltd. ("Spyglass") to serve as the designated investment advisor for each of the above Preferred SPVs. Each of these entities— BCI, Spyglass, Sentinel, SGS, ORC/Diversified, GMS, and PICI (together with other Preferred SPVs, South Bay, BCI, and the other investment affiliates founded by the BCI Principals, the "Biscayne Group of Companies")—was integral to the BCI Principals' scheme to conceal South Bay's failed investments and their own misappropriations.

32.     The BCI Principals and various BCI and Spyglass representatives continued to direct investors to invest in the Preferred SPVs, which in turn transferred money to South Bay to allow it to conceal its financial difficulties by paying interest payments or repaying old investors who requested redemptions or withdrawals. New money was continually raised, or maturities of debt extended, to conceal the failed investment and to facilitate ongoing misappropriation. New investors were not told that their money was going towards a scheme to conceal a massive real

---

[1] Diversified was previously named ORC Senior Secured Limited ("ORC").

estate investment failure or to fund ongoing misappropriations by the BCI Principals. Rather, investors and clients of the financial advisors thought they were investing in a real project with prospects of success, enabling the scheme to last for a lengthy period.

33.     Although the original real estate development failed in the 2007-2008 timeframe, new funds and offerings were established in 2008, 2010, 2011, 2012, 2015, etc., as new vehicles were needed to raise more and more money.

### 6. Deutsche Serves a Key Role in the Fraudulent Scheme By Facilitating Offerings and Providing Agency Services on the Preferred Debt

34.     The BCI Principals' scheme required that the Preferred SPVs make offerings of Preferred Debt that could be placed with clients by the BCI Principals and BCI-affiliated financial advisors. Each such offering was documented in an offering memorandum, which purported to contain the key disclosures about the offering to prospective investors. These disclosures provided background on the Preferred SPV, including the place of formation, its directors, as well as information about the offering, such as the use of proceeds, interest payable, repayment schedule, and fees.

35.     The offering memoranda also disclosed the roles of key third parties that facilitated the offering and administration of the Preferred Debt. For example, the BCI-affiliate Biscayne Uruguay was typically designated as "Dealer and Calculation Agent," using its network of financial advisors to direct clients and client funds to subscribe to the offering. The BCI Principals also needed a well-known, unaffiliated third-party bank to facilitate the offering of standardized notes by performing various tasks associated with the Preferred Debt in an offering.

36.     The BCI Principals caused the Preferred SPVs to enlist Deutsche to perform these tasks for virtually all of the Preferred SPVs' offerings. As a result, the offering memoranda generally designated Deutsche as the Issuing Agent, Principal Paying Agent, and Transfer Agent.

37.     In these roles, Deutsche performed the day-to-day functions necessary to take in investor funds, track ownership of Preferred Debt, and administer payments to holders of the Preferred Debt.

38.     As Issuing Agent, Deutsche distributed the certificates issued by the Preferred SPVs and collected the certificate purchase price from investors.

39.     As Principal Paying Agent, Deutsche was responsible for making the periodic coupon payments from the Preferred SPVs to investors.

40.     As Transfer Agent, Deutsche handled other tasks such as recording transactions and delivering communications from the Preferred SPVs to investors. The communications distributed by Deutsche to investors included, among other things, copies of the offering memoranda for the Preferred Debt in which investor funds were placed.

41.     As Registrar, one of Deutsche's affiliates created and maintained records tracking the Preferred SPVs' certificate holders.

42.     Deutsche needed to communicate and coordinate closely with the BCI Principals and several key personnel that worked for them so it could fulfill its various agency responsibilities. The Agency Agreement for PICI provides several specific examples why these tasks required such extensive interaction with the BCI Principals. It required Deutsche to, among other responsibilities, "keep a full and complete record of all Notes and Coupons…and of their redemption, purchase, cancellation, or payment," and to share those records with the issuer, to arrange for the delivery of PICI's notices to investors, and to make all the payments owed by PICI to its investors. The Agency Agreement even authorized Deutsche to make necessary payments out of its own pocket and obtain reimbursement from PICI.

43.     In addition, the BCI Principals worked closely with Deutsche in preparation for new offerings of Preferred Debt. Deutsche received advance copies of the Preferred SPVs' offering documents, reviewed the contents, and often provided comments. Moreover, Deutsche was responsible for helping disseminating offering memoranda to investors.

44.     For example, Deutsche served as the paying agent, and one of its affiliates as registrar, for notes issued by the Preferred SPV, ORC, under the name ORC Senior Secured Limited Series II. In August 2013, Deutsche collaborated with the BCI Principals on the ORC Senior Secured Limited Series II offering memorandum (the "ORC II Memorandum"), reviewing drafts and offering comments and proposed revisions.

45.     In its "Conflicts of Interest" section, the ORC II Memorandum disclosed that ORC was owned entirely by a holding company that was wholly owned by the BCI Principals. The ORC II Memorandum also disclosed that ORC would invest primarily in South Bay, and that South Bay was partially owned by the same individuals. Many of the same conflicts were described in other offering memoranda that Deutsche received, including the offering memoranda for the June 2012 offering for SGS, the 2013 offering for PICI, and the 2014 offering for GMS. Deutsche had also received a second, January 2011 memorandum for PICI that did *not* disclose any conflicts of interest—an omission that Deutsche apparently ignored even though it knew about the existence of these conflicts.

46.     In its "Risk Factors" section, the GMS memorandum also described the circular nature of GMS's business plan. It stated that if the GMS offering did not raise enough capital to complete all of South Bay's real estate developments, that South Bay would be unable to pay back its obligations to GMS unless it raised more money from the Preferred SPVs, including GMS itself.

In other words, South Bay would have to borrow more money *from* GMS in order to avoid defaulting on the GMS notes.

47.    Individuals throughout Deutsche's organization were aware of this self-dealing. Many employees in the London branch, including Paul Yetton, were intimately involved helping the Preferred SPVs issue multiple rounds of securities. In addition, Deutsche employees in the bank's operations area—including operations employees who later became involved in almost daily operational or compliance issues with the Madison account, such as Javier Britos—had a hands-on role in connection with the Preferred SPVs.

### 7.    The BCI Principals Restructure Offshore to Avoid SEC Scrutiny of the Biscayne Group of Companies

48.    In 2012, the SEC initiated an examination of BCI. As a Florida-based US-registered investment advisor, BCI was one of the few Biscayne-related entities within the SEC's oversight and regulatory authority.

49.    In response, the BCI Principals began a restructuring intended to place BCI and their investment activities outside the SEC's jurisdiction and prevent the examination from exposing their ongoing scheme. The BCI Principals formed Biscayne Capital Holdings Ltd. in Bermuda and, in August 2012, began transferring the assets and operations from BCI to this new entity or one of its subsidiaries. After this restructuring, the assets and operations previously housed at BCI became owned and managed outside the United States.

50.    Further removing their operations from the reach of the SEC, the BCI Principals moved additional investment advisory and brokerage activities from BCI to Biscayne Uruguay and worked with Haberer's contacts at Deutsche to open custody accounts with Deutsche for Biscayne Uruguay.

51.     Following its examination, the SEC launched a formal investigation in 2014 into the suspicious activities of BCI, the BCI Principals, and several of the Preferred SPVs. This led the BCI Principals to restructure the vehicles through which they operated their scheme and to begin moving their assets through various foreign entities to further protect against potential SEC enforcement.

### 8.     The BCI Principals Create Madison Amidst the SEC's Inquiry into BCI's Activities

52.     The BCI Principals' most significant effort in circumventing SEC enforcement was to form and move operations to Madison, a new entity domiciled in the Cayman Islands outside the reach of U.S. regulators. Initially owned by Rueda, the father of JC Cortes and RG Cortes, the BCI Principals formed Madison to serve as a clearinghouse for settling securities transactions and making cash transfers in furtherance of their scheme. Externally, Madison was presented as an entity that was similar to BCI and later Biscayne Uruguay—*i.e.*, a financial services company that served as a broker and investment advisor in the Ibero-American markets for the Biscayne Group of Companies.

### 9.     Madison Opens its Account with Deutsche

53.     Shortly after forming Madison, Haberer and the BCI Principals tapped Gustavo Trujillo ("Trujillo") to manage its operations. A long-standing confederate of the BCI Principals, Trujillo had started working for the Cortes family in the operations department of their insurance company when he was 21 years old. Despite having no professional degree or other credentials qualifying him to work in insurance or investment administration, over time Trujillo became a trusted figure in the Cortes family's business dealings and was eventually elevated to manage the back-office operations of BCI and Biscayne Uruguay. Haberer and the BCI Principals turned to

Trujillo to manage Madison in connection with their plan to move additional back-office investment, brokerage, and custody activity for the Preferred SPVs to Madison.

54.     The BCI Principals worked with Haberer and Trujillo to expand Deutsche's role in the scheme by having Deutsche serve as Madison's primary custody banking partner. Haberer and the BCI Principals had developed a close working relationship with Deutsche through Deutsche's agency work for the Preferred SPVs, and, through Biscayne Uruguay, had established the group as a client of Deutsche's custody banking services.

55.     In early late 2013 and early 2014, Haberer and Trujillo had discussions with Floris Vreedenburgh ("Vreedenburgh"), one of their closest contacts at Deutsche who worked out of its New York branch, about extending Deutsche's custody and banking services to Madison. On February 27, 2014, Vreedenburgh travelled from New York to South America to follow up on these discussions and meet with Haberer and his team in person in early March 2014.

56.     On information and belief, at the meeting, Haberer shared with Vreedenburgh their plan to have Madison serve as the primary investment advisor and broker for the Preferred SPVs and other affiliates of the BCI Principals. As reflected in contemporaneous emails, Vreedenburgh explained that Deutsche would allow Madison to set up a primary custody account for Madison, as Deutsche had done for Biscayne Uruguay, and Madison could then establish separate custody accounts for the Preferred SPVs and its other "clients." Vreedenburgh also explained that Deutsche would need to perform its own due diligence on any third parties for whom Madison sought to set up custody accounts, but that if Madison established the accounts as a "subaccounts" for the Preferred SPVs under Madison's own name, the onboarding due diligence process could be circumvented.

57.     More importantly, this arrangement would allow the BCI Principals to use Deutsche to process millions of cash transfers to perpetuate the scheme while avoiding external oversight. The BCI Principals understood from Vreedenburgh that by setting up subaccounts for the Preferred SPVs under Madison in this way, Deutsche would internally treat the Madison custody subaccounts as simply another account owned by Madison. As a result, Deutsche would freely process "direct payments" of cash outside of the scrutiny of an external custody agent. Previously, the Biscayne Group of Companies had used external custody agents like DMS Bank and Trust to settle securities transactions. Cash transfers through DMS had to be clearly associated with settlement or other custody services it provided, restricting the extent to which external DMS custody accounts could be used to process cash transfers to prop up the scheme. By contrast, Deutsche's lax custody environment would allow Madison to process what would otherwise appear as suspicious cash transfers under the guise of legitimate securities settlement activity.

58.     Vreedenburgh therefore informed Haberer about a gaping hole in Deutsche's client intake, onboarding, and cash transfer oversight process. Specifically, so long as the name of the subaccount began with the name of the client for the overall account, it did not matter to Deutsche who or what entity name followed or what entity actually owned the funds and securities in the account. Once Vreedenburgh explained this insider's view of how to bypass scrutiny by the bank's control systems, Haberer dutifully followed up on the suggestion.

59.     Vreedenburgh, as well as his colleague who worked on the Madison account, Scott Habura, admitted in sworn testimony that naming the subaccounts in this way circumvented the bank's on-boarding requirements:

Q:     Somebody [Vreedenburgh, in his sworn testimony] else described it as they in titling the property they were able to circumvent the on-boarding requirements of a new account. Does that sound accurate to you?

> A:    Yes. That sounds pretty accurate. I think Deutsche Bank looked at it
>       as if it's still Madison, it's just a sub-account of Madison, so it's still the same
>       legal entity Madison.

[Habura Transcript at 24].

60.    Indeed, so long as Trujillo followed Vreedenburgh's directions, Deutsche conducted no due diligence, not even a step as simple as confirming that the entity named in a subaccount was a real legal entity.

> Q:    So, for example, we saw the names of these entities. There wasn't even
>       like as basic of a confirmation that an entity was a real entity, correct?
>
> A:    No, we didn't, we didn't look at that as an entity. We looked at Madison as the
>       entity.

[Habura Transcript at 83].

61.    Vreedenburgh and Habura testified that this subaccount loophole was not permitted by any formal Deutsche policy or procedure. [Vreedenburgh Transcript at 135-36; Habura Transcript at 82-83]. Yet Deutsche allowed the BCI Principals to use the subaccount process to circumvent the onboarding process that was designed to "expose people if they are criminals." [Vreedenburgh Transcript at 194].

62.    During and as a result of these discussions with Trujillo, Vreedenburgh and others at the bank knew that Madison was an extension of the Biscayne Group of Companies. By the time the Madison account was opened, Deutsche knew virtually all the pertinent information about the Preferred SPVs, yet Deutsche had never raised any concerns about the Preferred SPV offerings or with the conflict disclosures in the offering memoranda that it had received and reviewed. In addition, Deutsche was still providing custody services for Biscayne Uruguay, and Deutsche had never raised concerns about performing this work given the disclosed conflicts among the Biscayne Group of Companies. Deutsche personnel had close working relationships with several

principals of the Biscayne Group of Companies, including Haberer, Trujillo, RC Cortes, and JC Cortes.

63.     On March 3, 2014, Trujillo confirmed these discussions in writing, emailing Vreedenburgh in New York to ask Deutsche to open a custody account for Madison and "establish a new relationship with one of the entities related to Biscaynes group." Vreedenburgh responded that Deutsche was "looking forward to expanding our collaboration on the custody front," and told Trujillo that Deutsche could establish custody accounts with an unusually low minimum monthly fee "given these accounts are incremental business with an existing relationship." Thus, Vreedenburgh's email clearly reflects that Madison was part of the "existing [Biscayne] relationship." Indeed, Vreedenburgh proposed that the "fee arrangements currently in place for Biscayne" apply to the Madison custody account.

64.     The emails between Trujillo and Vreedenburgh also confirm the discussions between Vreedenburgh and Deutsche about bypassing the bank's internal controls. As part of Trujillo's recap of the meeting with Deutsche, he wrote "Open Subaccounts **under Madison umbrella** [i.e., without requiring independent due diligence or know-your-customer review] for financial institutions introduced by Biscayne Group." (emphasis added)

65.     The interconnection between Madison and the other Biscayne entities remained obvious, as Trujillo's March 3, 2014 email to Vreedenburgh simultaneously asked him about opening an account for Biscayne Capital Bahamas and a related entity in the British Virgin Islands.

66.     Soon after Trujillo's and Vreedenburgh's early March 2014 emails, Deutsche's New York Branch and Madison executed a Multi Market Custody Agreement (the "Custody Agreement," attached as Exhibit A), dated March 7, 2014, together with an E-Mail Addendum (the "Addendum," attached as Exhibit B) executed as of the same date. Rueda signed the Custody

Agreement on behalf of Madison, and provided Deutsche with a copy of Madison's management

structure, which listed himself as the "Director – Shareholder," Haberer as the "General Manager,"

and Trujillo as the "Operations Manager."

67.     The Custody Agreement was, at its name suggests, a custody account for holding

and transacting with securities. It was not a cash or a checking account. Vreedenburgh testified in

related bankruptcy proceedings about the limited intended purpose for a custody account such as

the Madison account:

> Q:     But, generally, the purpose of the relationship was not to hold cash or to
>        engage in cash-related transactions. Correct?
>
> A:     The purpose of the relationship was to hold and settle securities which
>        could have a cash part to it. It wasn't to run a checking account. That's
>        never the purpose of a custody account. The custody account is on the basis
>        of a – everything cash is based on or supposed to be based on a securities
>        transaction.
>
> Q:     So activities such as wire transfers to pay a credit card or to an individual just
>        into their checking account generally is not the type of activity that should be
>        ongoing in these accounts. Correct?
>
> A:     Correct. And if that happened, we would approach the client and remind them
>        that the purpose of the custody account was not to do that.

[Transcript at 41-42].

68.     Scott Habura from Deutsche gave similar sworn testimony to Vreedenburgh:

> Q:     The purpose of these custody accounts was not to do day-to-day transactions
>        of wire transfers or to pay bills and so on, correct?
>
> A:     Yes. Generally that was, the purpose was buy and hold. That's the definition of
>        custody.

[Transcript at 24-25]. Habura elaborated that the purpose of the account was not to make ordinary

course payments such as rent, payments to corporate affiliates, or payments of credit card bills.

[Transcript at 90-91].

69.     Vreedenburgh also testified that overdrafts were not permitted in custody accounts: "We won't provide credit. So they would have to fund the custody account and then we will settle the transaction versus their custody account using the money that's in there." [Transcript at 35].

70.     By the time that the Madison account was set up in 2014, Trujillo already knew that Deutsche did not permit custody accounts to be overdrawn. Indeed, Vreedenburgh had told Trujillo directly by emails on February 1, 2013, which were also sent to a "DSS US" Deutsche email address that went to members of the operations group. By that time, Vreedenburg had already had regular interactions with Trujillo, having helped the group that Trujillo led resolve a series of irregular and unmatched transactions that were run through Deutsche custody accounts for various Biscayne entities. When Trujillo had asked Deutsche to accept an overdraft, Vreedenburgh told him flatly, in Spanish, "Quiero alcarar que en custodia no prestamos serivcios de credito a neutros clients." (I want to clarify that in custody we do not provide credit services to our clients.) Trujillo responded by asking Deutsche to make an exception. Vreedenburgh replied firmly, but cryptically, "Sabiendo lo que sabemos, lamientemente no." (Knowing what we know, sadly no.)

10.    **Deutsche Immediately Sets Up Madison's Subaccounts Without Conducting Any Due Diligence**

71.    The Custody Agreement did not mention subaccounts even though an important aspect of the plan discussed by Vreedenburgh, Haberer, Trujillo, and others was that subaccounts would be set up immediately upon creating the Madison account. Deutsche's New York branch set up a primary custody account in the name of Madison along with subaccounts for each of the Preferred SPVs. In total, Deutsche set up at least thirty (30) custody subaccounts for various Preferred SPVs and other entities within the Biscayne Group of Companies that Madison managed. *See* Account List, Exhibit C. Yet Deutsche did not undertake separate onboarding or due diligence for the subaccounts because Haberer, Trujillo, and others at Madison used the ploy suggested by Vreedenburgh. The failure to do so was a departure from industry standards and provided Madison with the banking environment it needed to make the series of circular cash transfers to maintain the scheme.

72.    The use of the subaccounts also made offering documents for the Preferred SPVs omissive. The offering memoranda for many (if not all) of the Preferred SPVs listed their material contracts and third-party service relationships, but did not reflect that Preferred SPVs used Madison and its custody accounts at Deutsche. Deutsche reviewed these offering memoranda, but it did not object to setting up custody arrangements with Madison that had not been disclosed to the Preferred SPVs' investors.

73.    Moreover, rather than conducting due diligence before opening subaccounts, Deutsche waited until after it set them up and made a perfunctory request for documentation from Madison showing the underlying beneficial ownership for each of the entities with a Madison-managed subaccount with Deutsche. This perfunctory request was meaningless and suggests an

effort to paper the file because Deutsche clearly knew at the time the accounts were opened that Madison and its principals were closely related to the Biscayne Group of Companies.

74.     Indeed, Deutsche had received and reviewed offering memoranda that disclosed the ownership of several of the Preferred SPVs. Moreover, Trujillo's March 2014 emails about opening accounts for Madison: (1) described Trujillo as still serving as the Vice President of "Operations and Trading" for one of the Biscayne Group of Companies; (2) noted that Madison was an entity "related to the Biscaynes [sic] group"; and (3) stated that Rueda, Madison's shareholder, was also "a director and shareholder in BiscayneCapital." Vreedenburg had acknowledged as much, having established Madison's accounts on the basis that they were "incremental business with an existing relationship" between Deutsche and Biscayne.

75.     Nonetheless, in response to Deutsche's perfunctory inquiry, on or around July 20, 2015, Trujillo disclosed the following to Deutsche:

<strong><u>Table 1 – Subaccount Ownership Disclosures</u></strong>

| Account | Disclosed owners as of July 2015 |
|---|---|
| 153-05090 ██████████████ | ████ |
| 153-05091 ██████████ | █████████████████████ ██████████████████) |
| 153-05092 ████████████ | █████████████████████ ███████████████ |
| 153-05093 ███████████████ | █████████████████████ ██████████████████) |
| 153-05094 ██████████████ | █████████████████████ ███████████████ |
| 153-05095 ██████████ | ████████████████ ███ |
| 153-05097 ███████████ | █████████████████████ █████████████████████ |
| 153-05098 ████████████ | ███████████████ |



| Account | Disclosed owners as of July 2015 |
|---|---|
| 153-05110 ████████ | ████████████████████ |
| 153-05111 ████████████████ | ████████████████████████ |
| | ████████████████████ |
| 153-05112 ████████████████ | ████████████████████████ |
| | █████████████████████████ ) |
| 153-05114 ███████████ | █████████████████████████ |
| | ████████████████████████ |
| 153-05115 █████████████ | ████████████████████████ |
| | ███████████████████ ) |
| 153-05116 █████████████ | ████████████████████████ |
| | ███████████████████ ) |
| 153-05118 █████████████ | ████████████████ |
| 153-05119 ████████████ | ████████████████████████ |
| | █████████████████████████ ) |
| 153-05120 ████████████ | ████████████████████████ |
| | █████████████████████████ ) |

76.     Over time, hundreds of improper large cash transfers were made through Madison's primary custody account and these subaccounts with Deutsche, all of which were held in Madison's name. Deutsche's active assistance to Haberer, Trujillo, and others regarding the opening of the custody accounts was followed by Deutsche turning a blind eye with respect to the use of those accounts.

### 11.     Trujillo Becomes Madison's Beneficial Owner and Continues the Scheme with Deutsche's Assistance

77.     Serving as both Madison's custody bank and in various agency roles for the Preferred SPVs, Deutsche's wide-ranging role facilitating the scheme went well beyond processing cash transfers and administering the custody accounts. For example, Deutsche kept track of the amount of debt that each Preferred SPV was authorized to issue, as well as the amount actually issued. In March 2014, Deutsche observed that the Preferred SPV GMS had issued more

debt than was authorized by its offering documents and raised the issue with Trujillo. Deutsche proposed a solution to this problem and advised Trujillo on the documents that GMS needed to amend to conform the documents to the amounts actually borrowed. Once GMS and several other Preferred SPVs' documents were amended to allow them issue more debt, Deutsche offered to draft Trujillo's email to the external clearinghouses that facilitated the trading of GMS's debt, informing them about the new terms governing the Preferred SPVs and ensuring that the BCI Principals could continue to execute trades without interruption.

78.     Deutsche also helped Trujillo and the BCI Principals extend the maturity of the Preferred Debt to delay repayments to investor clients. In October 2014, Trujillo emailed Deutsche's representative, Paul Yetton, to ask how to extend the maturity date of the PICI notes. Yetton responded that Trujillo would first need to get note holder approval, then submit blacklined versions of the documents to Deutsche. When Trujillo asked about the process for getting approval from the note holders, Yetton advised Trujillo that he may need to convene a noteholder meeting and sent Trujillo the agency agreement and offering memoranda for PICI.

79.     Toward the end of 2015, the BCI Principals asked Madison's "Operations Manager," Trujillo, to take over Rueda's position and become the beneficial owner and principal of Madison. By this point, Trujillo had worked with RG Cortes and Rueda for almost 15 years and was a central figure in Madison's operations. The change in ownership did not change the Madison-Deutsche relationship because Deutsche had been already dealing with Trujillo for many years, initially at Biscayne and more recently as Deutsche's day-to-day contact at Madison.

80.     As directed by Haberer and the BCI Principals, Trujillo continued using Madison to direct transfers and to carry out the scheme to conceal the investment failure and the misappropriations of the BCI Principals.

81.     Years later, Trujillo was charged with—and pleaded guilty to—wire fraud and money laundering for his many years-long role in the sale of investments tied to the real estate development through the Biscayne Group of Companies. *See* Trujillo Criminal Information, Exhibit D. Documents in Trujillo's criminal proceedings revealed further details that showed how Madison was used as a vehicle to continue carrying out the fraudulent scheme.

82.     At his deposition, Habura was shown several emails between Trujillo, Habura, and others at Deutsche that showed glaring misuse of Madison's accounts at Deutsche. Habura—who had left the bank before Trujillo's indictment—seemed almost to expect that Trujillo's use of Deutsche accounts during his tenure would result in criminal charges:

> Q:     Would it surprise you to know that Mr. Trujillo was actually charged criminally for his use of the Madison account?
>
> A:     Not after seeing everything today it wouldn't surprise me, no.

[Transcript at 121]. Habura's nonchalant reaction to Trujillo's indictment further underscores that the red flags he and others knew about were indicia of criminal activity. In fact, the only thing that shocked Habura was the complete lack of controls at Deutsche:

> Q:     It doesn't shock you thinking of it in those terms that Mr. Trujillo was able to launder money through those accounts, correct?
>
> A:     No, that doesn't. It shocks me that Deutsche Bank didn't have stricter policies in place.

83.     Habura's testimony in this regard was substantially the same as Vreedenburgh's, who reached the same conclusion, and moreover concluded that the subaccounts were essential to the fraudulent scheme:

> Q:     We're almost done here. But it's clear to you as you sit here that there really were no controls over this Madison account. Correct?
>
> A:     I would say that there were no effective controls, right.
>             …

> Q:    The fact that they were able to open the sub-accounts in order to make the investment transactions, that probably played a big part in them being able to extract the cash to carry out their fraud. Correct?
>
> A:    Right. And to hide the scheme I guess. Because they were doing some kind of securities-related activity, but not enough to fully convince us, I suppose, or not in time, but that it was pure securities transactions.

[Transcript at 202].

84.     According to the criminal indictment filed against Trujillo, throughout July 2015 and May 2016, he executed the sale of investments "knowing that the real estate projects purportedly funded by the Cayman Islands Funds were insolvent and had no reasonable prospect of generating returns." And he created false and fraudulent bank statements that purported to show that clients' funds were "safely invested in the Cayman Islands Funds." In addition, Trujillo made purported interest payments to clients "to deceive them into believing that their investments were generating returns, when in fact their money was not invested in real estate and was not generating returns."

85.     Trujillo also allowed Madison accounts to be used for corrupt payments to government officials. For example, Madison's accounts were used to disguise bribes for a client who rigged a bid for a contract with PetroEcuador. In furtherance of this scheme, Trujillo facilitated a transfer into the Madison accounts with Deutsche of approximately $2.9 million in contract proceeds from PetroEcuador and then he "wired and caused to be wired at least $2.3 million" from the accounts "to repay certain…clients and other debts."

86.     Trujillo orchestrated numerous other fraudulent transfers using Madison's accounts at Deutsche in 2015 and 2016. Deutsche never attempted to stop these transfers, despite having access to the details of all transfers between and among the Biscayne Group of Companies and the BCI Principals through the Madison accounts. Moreover, given that Deutsche was compensated

per transaction on top of its fees for agency services, Deutsche benefitted from maintaining Madison's fraudulent business, which involved transfers that were both unusually high in volume and demonstrably indicative of fraud upon even a cursory review.

87.     Moreover, Trujillo was not the only one indicted for the multi-faceted scheme. Chatburn was indicted in 2018 in the Southern District of Florida. The government charged him with, among other things, conspiracy to violate the Foreign Corrupt Practices Act and conspiracy to commit money laundering. The charges arose from an alleged conspiracy to make corrupt payments to PetroEcuador and the concealment of bribes through intermediaries, including a shell company, Denfield Investments Inc., ███████████████████████████████████

███████

88.     Chatburn pleaded guilty to the money laundering conspiracy and submitted a factual proffer. In addition to the PetroEcuador bribes, Chatburn admitted that he conspired to conceal bribes paid to Odebrecht S.A., a Brazilian construction company. Chatburn admitted to an improper $400,000 payment from an Odebrecht entity "to a Cayman Islands account controlled by [Chatburn]." On information and belief, Plaintiffs believe that Cayman Islands entity to be Madison.

89.     It was obvious upon even a cursory review of subaccount statements that there was substantial activity in the Madison account that was not related to custody securities transactions. For example, the July 2015 statement for the SGS subaccount included wire transactions that were described as "FUNDS WIRED TO BISCAYNE BANK" in the amount of $150,000; "FUNDS WIRED TO SOUTH BAY HOLDINGS, LLC" in the amount of $1,330,000; and "FUNDS WIRED TO GUSTAVO TRUJILLO" in the amount of $7,500. At his deposition, Habura admitted that none of those entries appeared to be related to securities transactions, and

the same was true for other wire transfers to RG Cortes and "Weisson Holding," among other entities related to the BCI Principals. [Transcript at 98-99].

90.     Deutsche had good reason to believe that the transfers discussed above (and others) were not legitimate, as they were clearly inconsistent with the use of proceeds disclosed in the offering memoranda that Deutsche had received, reviewed, and then distributed. For example, the offering memoranda for the SGS Series 2014, Series 2016, and Series 2018 offerings—provided to Deutsche around the time that Madison established custody accounts with Deutsche—each stated that:

> The Issuer [SGS] shall apply all proceeds from the issuance of Notes (less the Sales Charge) to apply for interests in the Referenced Entity [South Bay].

Despite this clear restriction on capital raised, Madison's SGS subaccount at Deutsche showed

### 12.   In Early 2016, Deutsche's Internal Compliance and Operations Staff Raise the Alarm About Improper and Suspicious Activity in Madison's Account But Deutsche Continues to Process Madison's Trades

91.     Members of Deutsche's operations department were highly concerned by the improper and suspicious activity in the Madison account in 2015 and 2016, which was indicative of fraudulent activity. As explained in detail below, in January and February of 2016, Deutsche chose to ignore these concerns and turn a blind eye to the red flags concerning Madison while other Deutsche officers servicing the account (Vreedenburgh and Habura) helped Trujillo carry on his fraudulent trading. Amid its knowledge and concerns about red flags and compliance problems, Deutsche continued participating in the ongoing operation of Madison's business by executing

Madison's transactions. Deutsche knowingly chose to process transactions that it knew involved suspicious, non-custody-related wires, and even vouched for Madison's legitimacy to third parties at the same time that Deutsche was threatening to halt further improper transaction activity in the account.

92.     The compliance issues in January 2016 were not new to Deutsche. Rather, they were an escalation of prior issues that the operations and relationship managers had ignored and allowed to fester. Habura, who had day-to-day involvement in the account, gave Trujillo advance warning about the operation group's increasing concerns in a January 19, 2016 email. Habura's email warning made it clear that the bank's awareness of the red flags was not a new development. Rather, Habura remarked that "My operations team has ***again*** brought to my attention the number of wires and the hundreds of beneficiaries for both Madison and Biscayne Bahamas, that these wires are going out to. They have concluded that the majority of these wires are not related to the custody activity in the accounts." (emphasis added).

93.     By this time, Deutsche knew full well that Madison was engaged in fraudulent trading outside the scope of the nature and purpose of its custody account. There was no legitimate reason for sophisticated financial professionals like the BCI Principals to use custody accounts to execute hundreds of cash transfers that were unrelated to securities transactions. Deutsche's professional banking officers assigned to the Madison account—Vreedenburgh, Habura, and the operations team—were also sophisticated and experienced with the proper use of custody accounts. The only conclusion that these professionals could reach is that these transfers were made for a fraudulent purpose.

94.     Habura's January 19th email also re-confirmed another longstanding fact: despite the fact that Madison and its subaccounts were legally distinct from the rest of the Biscayne Group

of Companies, Deutsche considered the Madison account part of an overall business relationship with the Biscayne Group of Companies. The same problems and obvious red flags were endemic for both Madison and Biscayne Bahamas, and the issues were escalated simultaneously by the same operations team even though Deutsche technically had separate relationships with the two entities.

95.     In his deposition testimony, Habura confirmed how easy it was for the operations team to conclude that the account activity was irregular: the volume of transactions was a dead giveaway for non-custody activity. He testified, "The volume would be, yes, that would be the trigger for them [the operations team]." [Transcript at 107].

96.     Despite knowing that Trujillo was making hundreds of cash transfers unrelated to Madison's custody activity, Habura did not put a stop to the transactions in early 2016. Instead, he instructed Trujillo how to continue transferring money out of Madison for noncustodial purposes without attracting additional attention from Deutsche's operations team. By so doing, Habura helped circumvent any efforts to investigate the suspicious activity and participated in the dishonest conduct of Trujillo and others.

97.     Habura told Trujillo that he should route these unusual and improper payments through a different Madison bank account (with another bank) or to "financial counterparties," as opposed to recipients whose names would lead to further inquiries by the Deutsche operations team. This instruction was entirely cosmetic in nature—Trujillo's cash transfers, which Habura and others at Deutsche knew were suspiciously unrelated to securities transactions, would not be transformed into proper custody transactions simply by going to a "financial counterparty" instead of a confederate's personal bank account.

98.     Moreover, SEC pronouncements in 2015—widely distributed among those in the custody business—warned that a high volume of money movements and atypical wire activity in custodial securities accounts were a hallmark of money laundering and fraud. It was also widely known as of 2015 that individuals who were trying to evade bank anti-money laundering (AML) scrutiny were gravitating towards custody or brokerage accounts. The SEC warned the industry in 2015 that securities accounts that had high-frequency wire activity and other activity that was not commensurate with a customer's purported business objective would be the subject of compliance exams relating to AML. Not surprisingly, Trujillo was ultimately indicted for crimes that included money laundering.

99.     Thus, Habura and others at Deutsche knew full well that the improper activity in the Madison account suggested fraudulent activity. Moreover, they knew that hiding such suspicious activity by moving the money through an intermediary did not remove the taint of fraud or make the illicit activity underlying the transfers legitimate. Instead of halting the improper transfers, Habura's directions to Trujillo gave Deutsche plausible deniability and the opportunity to stop investigating what it already knew to be fraudulent activity while continuing its profitable relationship with Madison.

100.     Habura instructed that if Trujillo took those measures, Deutsche would continue to process his wire transfers even when they had nothing to do with securities transactions. Thus, just as Vreedenburgh had, in 2014, helped Trujillo and Haberer circumvent Deutsche's onboarding process for the Preferred SPVs by guiding him through the "subaccount" loophole, Habura similarly tried to help Trujillo avoid additional scrutiny of improper use of the custody accounts and continue Madison's fraudulent transfer activity uninterrupted.

101.    Deutsche's operations team had no problem with Habura providing this type of assistance to Trujillo. Operations knew about it: Habura copied Patrick Hannon, an operations supervisor, on his January 19th email, as well as Vreedenburgh.

102.    Trujillo responded to Habura's January 19th email that same day. Trujillo reported that he was in the process of going through due diligence with another bank to set up a new cash account, which he hoped to finalize later in January 2016. Trujillo also reported that he would follow up with his Biscayne colleague who was the point person for Biscayne Bahamas, Pablo Perrotta, and then Trujillo would report back to Habura and his colleagues about the problems with the Biscayne Bahamas account at Deutsche. Once again, Deutsche knew that it was dealing with the same group of individuals relating to suspicious activity across the Biscayne Group of Companies.

103.    In the weeks that followed these mid-January 2016 emails, even though Deutsche recognized that cash transfers to "hundreds of beneficiaries" were unrelated to custody activity, the bank continued to process improper wires out of the Madison account. On February 8th, Patrick Hannon from Deutsche's operations team responded to the January 2016 email chain and asked Trujillo and Habura for an update about Trujillo's efforts to obtain a separate cash account at a different bank. Hannon noted that "[t]he activity is persistent and we shouldn't continue to process such activity unrelated to trade settlement."

104.    The wording of Hannon's February 8th email further reflects a desire to sweep the wrongful transactions under the rug rather than ask further questions about them. Notably, Hannon did not ask Trujillo to provide the business explanation for particular wires. And Hannon and his operations team did not put a stop to this persistent misuse of the account in early February 2016. Further, Hannon admitted in his email that he knew that Deutsche "shouldn't" continue to process

activity that was unrelated to trade settlement. Yet despite this awareness that he was doing something that he should not do, Hannon and the Deutsche operations team knowingly and deliberately continued to process these improper transactions.

105.    Trujillo responded immediately to Hannon's February 8th email and reassured Deutsche that he was making progress setting up the new account. Trujillo said he expected to have a promising update in the following week. In order to help Trujillo open this new cash account to facilitate his improper transfers, Habura took the significant step of writing a letter of reference to ████████████, where Madison would have a new account. Habura ████████████████████ ████████████████████████████████████████████████████████ — effectively covering for a client whose activity had caused such persistent problems that Deutsche's operations group was privately threatening to severely restrict the activity in the account.

106.    Deutsche's repeated inquiries to Trujillo about the new account are telling, as are Habura's misrepresentations to ██████ about Madison. By suggesting that Trujillo open this account and use it to funnel cash out of Madison, rather than making transfers directly to recipients, Deutsche could continue to profit from its relationship with the BCI Principals. And Trujillo's opening of a new account gave Deutsche an excuse to de-escalate its investigation before it confirmed what Habura, Vreedenburgh, and others already knew or strongly suspected: that the BCI Principals were operating a fraudulent trading scheme or otherwise not operating a legitimate business.

107.    When Trujillo did not follow up his February 8th email in a timely manner, Hannon asked him by email on the morning of February 18th for an update. Notably, Hannon chose not to stop processing improper wires, nor did he ask questions about particular transactions. In other

words, Deutsche's account managers and operations team again chose to maintain the official status quo notwithstanding their very specific awareness of pervasive suspicious activity in the account that had several indicia of fraud.

108.    Habura sent another email to Trujillo later on the morning of February 18th, which reflected that the issues in the accounts of Madison and Biscayne Bahamas (and likely other related accounts) had "been flagged by our risk and compliance group." As a result of the unwanted additional attention from risk and compliance, Habura told Trujillo by email that effective immediately, the bank would only process wires that were associated with securities activity, which is the only activity that was supposed to occur in such accounts.

109.    The emails between Habura and Trujillo strongly suggest that risk and compliance finally took this additional step because of a different problem with the Madison account: there were significant overdrafts, which violated Deutsche's practice for custody accounts and threatened Deutsche's ability to profit from the relationship. Trujillo's response to Habura's February 18th email asked to speak by phone about the suspension of processing of non-securities transactions and "the overdrafts."

110.    Because Madison's custody account was designed for settling securities transactions, there was no legitimate reason for the account to be routinely or even occasionally in overdraft. Deutsche's custody group was not in the business of extending credit to its custody customers. Scott Habura confirmed this in his deposition testimony:

Q:    [W]hen you think of these custody [accounts], this is what I wanted to talk
       to you about, there should never be an overdraft, correct?

A:    Well, there shouldn't be. Theoretically, there shouldn't be.

Q:    This isn't the standard checking account where you can write a check and
       forget about it and then go somewhere else?

A:      No.

Q:      It should be custody-related transactions in and out, correct?

A:      That is correct. We didn't provide credit lines.

[Transcript at 85]. Habura further testified at page 86 of his testimony that overdraft situations were "rare" and typically arose in situations such as operational and processing errors. Typically, transactions involved trading securities for securities or securities for cash, such that if a counterparty did not pay, Deutsche would put the securities back into the customer's account, and there would not be an overdraft. In other words, when cash or securities are debited or credited in a custody account, as Habura testified, the exchange is "simultaneous." [Transcript at 91].

111.     Despite its strong aversion to overdrafts, Deutsche made the deliberate decision to extend credit to Madison by allowing the overdrafts to continue and suggesting it would monitor account activity more closely. On February 23rd, Habura warned Trujillo, copying Vreedenburgh, that account overdrafts "are now being looked at on a daily basis." Habura further warned that if the overdrafts persist "there will be action taken which may include closure of the relationship." As with the improper wire transfers, Deutsche merely threatened account closure in relation to the extensions of credit through overdrafts but continued to participate in Madison's fraudulent trading business all the same.

112.     When Habura provided this warning, he deliberately avoided asking the obvious questions about why there were ongoing overdrafts in an account that should not have them. The overdrafts were significant, and permitting them was not mere acquiescence by Deutsche. Rather, Deutsche made affirmative acts when it extended credit to Madison by actually funding Madison's transactions as opposed to having the transaction "fail" due to lack of funds. Confirming this,

Habura testified that an overdraft in a custody account was a result of a deliberate decision to "pay for the securities" despite the account not having sufficient funds. [Transcript at 113].

113.    Trujillo replied to Habura's February 23rd email that same day, imploring him to "give me a hand" and try to prevent account closures. Habura responded hours later, reassuring Trujillo that Habura would not take any steps himself to close any accounts, and unless and until someone else at the bank decided to do so, Habura "will try to help you as much as we can." In sum, Habura and Vreedenburgh did everything in their power to keep Deutsche earning fees from processing transactions in spite of the ongoing suspicious activity.

114.    Trujillo's response, which he sent later on February 23rd, confirmed that the overdrafts were quite substantial, *i.e.*, several million dollars. He advised that the forthcoming wires "in excess of 6MM" would resolve the overdraft situation. Vreedenburgh confirmed in his testimony that the overdraft was $7.5 million, which was a very significant red flag:

> Q:      So here we talk about that same email and then there's an internal email
>         with Fernando Haberer saying overdrawn by $7.5 million.
>
> A:      Wow.
>
> Q:      Isn't that a very significant red flag?
>
> A:      It is to me.

[Transcript at 184].

115.    In addition, in Trujillo's February 23rd response, he suggested that Deutsche overlook the overdrafts in particular accounts because Deutsche viewed the Biscayne Group of Companies "as one relationship." This improper request reflected Trujillo's expectation that Deutsche would *continue* to ignore legal distinctions between the various entities to accommodate him. Notwithstanding the fact that Deutsche and the BCI Principals commingled funds between

various entities, Madison's funds belonged to it, not another entity in the web of the Biscayne Group of Companies.

116.    The next day, Habura reluctantly—at the direction of others in the bank—told Trujillo by email that Habura had been ordered to stop processing certain types of securities transactions until the overdrafts were cleared. Habura advised that he had been instructed to "place a hold on any free deliveries and any receives versus payments," the effect of which was to put a lien on the securities in the account. Habura testified that this was an extreme and unusual step to take:

> Q:      Here's February 24, 2016, "I have been told to place a hold on any free deliveries of securities for your accounts and any receives versus payment until you can clear your overdrafts." Do you see that?
>
> A:      Yes. So that is basically putting a lien on the securities.
>
> Q:      This is a pretty extreme measure by the bank, correct?
>
> A:      Yes.
>
> Q:      At this point, it's pretty clear that the account is really in a troubled state, you're taking significant measures to protect the bank, right?
>
> A:      I would agree, yes.

[Habura Transcript at 118].

117.    Deutsche's decision to, in effect, put a lien on securities in the account in late February 2016, as opposed to terminating the account was the result of another conscious decision, not mere inaction.

118.    Also in late February 2016—while Deutsche was dealing with the repeated and significant overdrafts caused by non-custody activity, pushing (and helping) Trujillo to open a new cash account to funnel his activity through—Habura took another remarkable step to help the Biscayne Principals. A Biscayne confederate, Diego Rodriguez, asked Vreedenburgh to set up a

meeting with a concerned individual who had invested with the Biscayne Principals and wanted assurances at an in-person meeting with Deutsche regarding Madison's relationship with Deutsche.

119.    Vreedenburgh agreed and met with the investor on February 25, 2016, just one day after Deutsche placed a hold on certain transactions in the account. Once again, Vreedenburgh and Deutsche were willing to help the Biscayne Principals, even by taking an unusual step of meeting with someone who was not a Deutsche client. In effect, Deutsche became an arm of the sales and marketing efforts by the Biscayne Principals, who needed to assure a wary investor of Madison's legitimacy and help Madison secure the investor's continued business.

120.    In the weeks that followed, Habura communicated with Trujillo and others (including JC Cortes), about a "periodic review" of Biscayne-related accounts. In a March 11, 2016 email, Habura asked Trujillo to provide missing documentation that should have been provided previously, such as reliable information about entity ownership and who owned Biscayne Capital Holdings Limited.

121.    By mid-May 2016, if not earlier, Deutsche's operations group was circulating daily reports about wire activity for both Madison and Biscayne Bahamas. For example, on the morning of May 17th, Frederic Kolb in Deutsche's Jacksonville, Florida-based operations group circulated reports for Madison and Biscayne Bahamas to several layers of operations management, as well as Habura and Vreedenburgh. Kolb sent the reports to: (1) Javier Britos, (2) Britos's supervisor, Patrick Hannon; (3) Hannon's supervisor, John Binder; and (4) Binder's supervisor, Colm Hogan. Kolb designated the email, which contained client account information, as "Confidential."

122.    Hannon reviewed the internal report and replied just minutes to this email chain that included his boss and his boss' boss. Hannon pointed out to everyone two obvious examples of improper activity: wires that paid an American Express bill (which clearly had no connection to securities transactions) and payments to individuals that had no discernible connection to settlement of securities transactions. He remarked in this May 17th email that there was "similar behavior with the Biscayne relationship to that of Madison with respect to the wire payments."

123.    Of course, given that Hannon was copied on the emails described above from January and February 2016 about the improper wires in the Madison and Biscayne Bahamas accounts, Hannon was "reporting" something to his supervisors that he had known about for several months, if not longer. (It is unclear, absent discovery, whether Hannon had decided to report upwards in the operations chain of command or remain silent in January and February 2016.)

124.    In his May 17th email, Hannon also remarked, "Not sure if the Biscayne relationship is related to Madison, but thought we would include this activity in the daily email given the unusual activity." Hannon's statement that he was unsure about the existence of a connection between Madison and Biscayne Bahamas was false. As explained above, just a few months earlier, Hannon was copied on and authored emails about related activity between the same two entities, Madison and Biscayne Bahamas. Indeed, just a few months earlier, Hannon had admitted that the bank "shouldn't continue to process such activity" in both accounts, but he did so anyway.

125.    A few hours later, Habura forwarded Kolb's May 17th confidential internal email to Trujillo. Habura forwarded the email even though it was designated "Confidential" to internal Deutsche personnel and included information about Biscayne Bahamas, an entity for which Trujillo was not the designated point of contact. Forwarding client information to someone who

was not authorized to act on behalf of the entity likely violated many internal procedures. This further illustrates the lengths to which Habura was willing to do go to assist Trujillo and his confederates.

126.    In his May 17th email, Habura repeated to Trujillo the same advice Habura gave back in January—funnel the suspicious non-custody activity through a cash account at another bank and then Deutsche's supervisors would stop flagging the Madison and Biscayne accounts as problematic and risky. Thus, yet again, Habura advised Trujillo how to bypass Deutsche's restrictions and continue the scheme.

127.    Habura's May 17th email also warned Trujillo that Deutsche's compliance group "will be stepping in and halting activity." Habura was describing another affirmative decision by supervisory personnel at the bank to adopt a new remedial measure (halting certain activity) as opposed to deciding to close the account. Habura confirmed this in his deposition testimony:

> Q:    Surely after your May 2016 e-mail where you are saying you're halting this type of activity completely, the February e-mail we are talking about halting the delivery of securities free of payment. Clearly, at this point those transactions shouldn't have occurred, correct, going forward?
>
> A:    Well, that wasn't up to me. That was up to our risk and compliance whether or not they were going to continue to allow them or they try to remedy whatever their issue was.
>
> Q:    But in your e-mails you are saying that this activity is going to be halted going forward?
>
> A:    Yes, yes.
>
> Q:    So I just want to understand the mechanics, you sent that e-mail, obviously there was a discussion or meeting or instruction from somebody to say that, correct?
>
> A:    Correct.
>
> Q:    You didn't make that up?

A:     I would not.

Q:     Let me clarify for the record, you didn't have the authority to independently make the decision that it should be cancelled, that the activity should be stopped, correct?

A:     That is correct.

Q:     That is somebody else within Deutsche Bank would make that decision?

A:     Yes.

[Transcript at 122-23]. Trujillo's inability to comply with instructions and warnings from Deutsche's operations and risk personnel lead inexorably to the conclusions that (1) the Madison account was being used to perpetrate a fraud and (2) Deutsche was participating it by continuing to process transactions.

128.    At or around the same that Deutsche's compliance group was halting activity in the Madison account, Habura sent additional emails to Trujillo and others about a "periodic document review" involving the Biscayne Group of Companies. For example, in a May 10, 2016 email, Habura told Trujillo and JC Cortes that Deutsche was missing information such as ownership details for South Bay. When Habura made this request, he and the operations group already knew who the owners of the Biscayne Group of Companies were, including the owners of South Bay and PICI. The periodic "review" was just for show, not a serious effort to ask the hard questions about these suspicious accounts.

### 13.    In late May 2016, the SEC Publishes a Consent Order Detailing the BCI Principals' Violations of Federal Securities Laws and Imposes Sanctions Against Madison's U.S. Counterpart, BCI

129.    After a lengthy inquiry, the SEC entered and published a consent order (the "SEC Order") dated May 26, 2016. The Commission detailed its findings that BCI, the BCI Principals— including RG Cortes, Weisson and JC Cortes—together with Chatburn committed multiple

violations of the federal securities laws. *See* SEC Order, <u>Exhibit E</u>. In the order, the Commission found, *inter alia*, that the common beneficial ownership and effective control of BCI, certain Preferred SPVs, and South Bay created multiple conflicts of interest for BCI that should have been disclosed when BCI and the BCI Principals recommended and sold securities originally issued by the Preferred SPVs to BCI's clients from August 2010 through March 2012. The Commission also found that:

(1) South Bay's calamitous financial condition from 2010 through 2012—together with BCI's dependence on South Bay for financial support during this time and BCI's ownership by related parties—created multiple conflicts of interest that should have been, but were not, disclosed to investors;

(2) RG Cortes and JC Cortes wilfully aided and abetted the wrongdoing and caused BCI to make material misrepresentations about BCI and certain of the Preferred SPVs; and

(3) BCI failed to disclose material information concerning South Bay's financial condition, including that South Bay failed to generate enough revenue or operating cash flow to meet maturing debt, or sustain operations absent new funds generated by the issuance of new Preferred Debt, and as a result, had to renegotiate past-due debt.

130.    The Commission found that none of these conflicts nor South Bay's financial condition were disclosed to BCI clients for securities initially issued between August 2010 and March 2012, nor did BCI and the BCI Principals correct the misrepresentations. The Commission further determined that these failures constituted willful violations of Sections 206 and 207 of the Advisers Act, and as such, operated as fraud and deceit on BCI's investors.

131.    Deutsche, of course, was already aware of these conflicts and South Bay's dependence on circular and recurrent funding because, among other reasons, it possessed and

reviewed versions of the Preferred SPVs' offering memoranda that had supposedly been provided to clients and disclosed the conflicts and South Bay's financing.

132.    Because several offering memoranda received by Deutsche contained the conflict-related disclosures that were necessary for prospective investors, the SEC's conclusion that the early offerings of Preferred SPVs (from August 2010 through March 2012) had material misrepresentations and omissions when raising investor funds should have set off alarms for Deutsche with respect to the overall relationship with the BCI Group of Companies. Deutsche's agency services had helped the Preferred SPVs raise these investor funds and administer the investment, yet critically important disclosures were not made to investors. Deutsche's ongoing role as the custody bank for Madison facilitated the management of funds that the SEC Order indicated were raised without disclosure to investors and under circumstances that operated as "a fraud or deceit upon…client(s) or prospective client(s)."

133.    At a minimum, the publication of the SEC Order—as well as other irregularities in accounts relating to the BCI Group of Companies, such as overdrafts and non-arm's-length cash transfers—should have prompted Deutsche to immediate action. At a minimum, Deutsche should have conducted a real investigation into Madison and ensured that Deutsche was not complicit in an ongoing fraudulent scheme by continuing to serve as agent for the Preferred SPVs and custody bank for Madison. As discussed above, several in Deutsche's organization, however, had taken steps to thwart any such investigation before it happened.

134.    The Commission's finding that the Biscayne Group of Companies did not disclose conflicts of interest to investors for certain SPVs indicated that those investors did not receive certain Preferred SPV offering memoranda (or, at least, the same versions) that Deutsche possessed and reviewed which contained conflict of interest disclosures. Investors had apparently not been

told that South Bay was reliant on new debt from the Preferred SPVs to pay existing obligations—a fact that Deutsche knew based on its participation in reviewing and helping to prepare the content of several of the Preferred SPVs' offering memoranda. Deutsche further participated in the fraud by distributing offering memoranda that contained omissive or fraudulent disclosures.

135.     As a result of its findings, the Commission imposed both monetary penalties and sanctions on BCI, the BCI Principals, and Chatburn, including that each "cease and desist from committing or causing any violations and any future violations" of Sections 206 and 207 of the Advisers Act. The BCI Principals and Chatburn were also "barred from association with any broker, dealer, investment adviser [or] transfer agent" and "prohibited from serving or acting" in a role for a registered investment company for a minimum of three years. The Commission further assessed disgorgement and civil money penalties against BCI, the BCI Principals, and Chatburn.

136.     As described above, Deutsche already knew about the conflicts of interest, mismanagement, and self-dealing of the BCI Principals described in the SEC Order, and should have stopped providing services to the BCI Principals well before the SEC Order was published. Having failed to do so, Deutsche should have immediately halted the custody, banking, and cash transfer services that enabled Madison to serve its purported role as a broker dealer and investment advisor within the Biscayne Group of Companies once the SEC Order was published. It was imperative to do so given that Deutsche knew that the BCI Principals were still associated with Madison in contravention of the SEC Order. As the payment and transfer agent for the Preferred SPVs, Deutsche should have simply ceased to continue participating in and enabling the wrongful activity. That is, it should have stopped payment and agency activity associated with the Preferred SPVs until it could determine that, going forward, the trading and transfer activity associated with those entities complied with the SEC Order and securities laws. Further, Deutsche should have

notified Trujillo or the BCI Principals that until such compliance could be assured (likely knowing that it could not be), Deutsche would not resume providing services for Madison. Deutsche, however, knowingly failed to take any of these steps.

137.    That the SEC Order did not mention "Madison" by name is no excuse for Deutsche's failure to close to the Madison account. Deutsche knew about the common ownership of Madison and other companies in the Biscayne Group of Companies. Moreover, from the outset, Vreedenburgh viewed Madison as "a continuation of the Biscayne Capital relationship," as he testified at his deposition. [Transcript at 78]. Habura too testified that Madison was considered part of the broader Biscayne Capital relationship. [Transcript at 12].

### 14.    Deutsche Closes Some Biscayne Group of Companies' Accounts in Response to SEC Order, But Allows Others—like Madison's—to Stay Open

138.    Following the publication of the SEC Cease-and-Desist Order, Deutsche closed a limited set of accounts held by affiliates of the Biscayne Group of Companies. Deutsche apparently reviewed other related accounts that it had opened for the Biscayne Group of Companies, such as those with Madison and Biscayne Uruguay, but allowed them to stay open. Deutsche's decision to turn a blind eye to Madison's accounts was no accident or oversight given that Deutsche had undertaken an internal inquiry into the Biscayne Group of Companies' accounts for several months *before* the entry of the SEC Order.

139.    Yet the same issue raised by operations in early 2016 persisted. Deutsche had permitted that type of improper wire activity for years even though, as Vreedenburgh testified, payments not related to securities transactions should "light up a light" for the operations group. [Transcript at 49].

140.    But the SEC Order made it impossible for Deutsche to continue to ignore that the BCI Principals, Madison, and the Biscayne Group of Companies had severe conflicts of interest

in a failed investment, both of which had not been disclosed to investors. The SEC Order also made Deutsche unable to continue to ignore that the BCI Principals: (1) had failed to disclose those conflicts of interests to clients and investors in Preferred SPVs; (2) had made key omissions and misrepresentations about the ownership, operating history, financial performance, and prospects of certain Preferred SPVs; and (3) had used the Preferred SPVs to fund a failing enterprise without full disclosure to clients and investors. Deutsche further knew that, through the custody account and subaccounts it maintained for Madison, it was continuing to be a key participant in the scheme by making questionable transfers by and among the Biscayne Group of Companies, the BCI Principals, and related entities.

141.    Deutsche took no action to stop the scheme even though it failed to obtain all the documentation it requested in mid-2016 for related entities, learned of the securities violations in the SEC Order, knew Madison's accounts were owned or managed (directly or indirectly) by the subjects of the SEC Order, recognized it was continuing to provide normal agency services to the Preferred SPVs, and closed just a limited set of accounts based on information in the SEC Order while letting others to remain open and continuing to process millions more in ongoing transactions.

142.    Yet Vreedenburgh testified that Deutsche's typical response if a client stopped communicating about compliance issues was to stop transacting in that client's account:

> Q:    . . . When a client stops communicating about compliance issues, in your experience, what would happen at the bank? Would they close the accounts? Would they--
>
> A:    I think initially they would stop transacting. Close accounts may happen at a later stage. You can't just close an account, because there may be assets in it. But I would assume we stopped transacting.

[Transcript at 165].

**15.   Deutsche Requests, But Does Not Receive, KYC and AML Documentation for Madison-Managed Entities, and Belatedly Closes the Madison Account**

143.   In late 2016 and early 2017, Deutsche compliance and anti-money laundering personnel made additional requests to Trujillo for information on the Madison-managed entities and related account activity. These requests included the latest available financials and documentation showing the ownership structure for different Madison-managed entities in November 2016, January 2017, and June 2017. At each juncture, representatives for the Madison-managed entities either did not respond, stalled and made excuses, or sent incomplete information such that Deutsche's information requests remained outstanding for several months.

144.   After certain early-June 2017 requests for updated documentation, on June 15, 2017, Deutsche's New York branch finally provided notice to Madison that it was terminating the Custody Agreement effective August 31, 2017, and closing Madison's cash and custody accounts "[a]s soon as practicable" after the termination date. *See* Deutsche Bank Termination of Custodian Services, Exhibit F. But by the time of the termination notice, irreversible damage had been done because Deutsche had allowed the Madison account and sub-accounts to be used for many millions of dollars of fraudulent transactions.

**B.   DAMAGES/TRANSACTION ANALYSIS**

145.   The Custody Agreement contemplated that the custody account and subaccounts would be used to hold and transfer cash to facilitate custody and settlement activity associated with Madison's purported broker and investment advisory services. Cash activity in the accounts would, therefore, be expected to be limited to two types of custody-related transfers: (1) securities-related transfers with accounts owned by Madison or the funds it managed; and (2) transfers with securities trading counterparties. Instead, cash was regularly commingled and transferred between and among the various Madison accounts and for purposes unrelated to custody and Madison's

supposed services as an investment advisor and asset manager. The majority of the improper cash transactions were processed through Madison's primary custody account and outside of any sub-account. Madison's principals exercised control over the money in this account and were responsible for the commingling of funds involving other entities in the Biscayne Group of Companies.

146.    Given Deutsche's extensive involvement and interaction with the BCI Principals, and its multi-faceted roles, there were at least four different types of cash transfer activity that was atypical for managed custody accounts, and either inconsistent with the Custody Agreement or contrary to the offering memoranda.

147.    *First*, there were regular and sizable direct cash transfers to personal accounts held either by BCI Principals directly or by entities clearly associated with BCI Principals' personal interests. For example, during 2015 and 2016, Madison subaccounts for ▓▓▓▓▓▓▓▓▓▓▓▓ made over $1 million in total direct transfers to the personal accounts for the BCI Principals. These transfers have no apparent investment-related purpose that would be appropriate for Madison's custody investment accounts and should have, at a minimum, raised questions and invited close scrutiny regarding their purpose and legitimacy of Madison's investment subaccount activity.

148.    *Second*, Madison's primary custody account shows several large wire transfers to third parties had a questionable or tenuous connection to supposed legitimate securities custody activity. These third parties included entities such as ▓▓▓▓▓▓▓▓▓▓▓▓ and ▓▓▓▓▓▓▓▓▓▓▓▓, each companies controlled by ▓▓▓▓▓▓ Ramiro A. Luque, the owner of Galileo Energy involved in the payment of bribes to obtain and retain Galileo's contracts with PetroEcuador. These types of transfers to ▓▓▓▓▓▓▓▓▓▓ total over $16 million

after May 27, 2016 and transfers to ████████████████████ before May 27, 2016.
Similar transfers made to ████████████████ before May 27, 2016.

149.    *Third*, there were a series of pass-through transfers from Madison's accounts and subaccounts, where funds were deposited in one subaccount and the same funds were immediately transferred to another subaccount before being transferred to an outside account. From 2015 to 2016, these pass-through transfers included transfers from ████████████ totaling almost $5 million and from ████████████ totaling over $5.7 million.

150.    *Fourth*, Deutsche processed over ████████ of transfers out of Madison's accounts at Deutsche since they were opened, many of which were facially suspicious or unrelated to legitimate custody and securities settlement activity. Of these, ████████ in transfers were made prior to publication of the SEC Order. After the SEC Order publicly revealed that Madison and its principals were using Madison's accounts to facilitate fraudulent financial activity, Deutsche continued to allow millions of transfers—over $164 million—to flow through Madison's primary custody account. Although the BCI Principals mixed legitimate transfers with illegitimate transfers, scores of large transfers were made in furtherance of the BCI Principals' fraud, using new investor dollars to repay legacy investors alongside misappropriating funds to the BCI Principals and their affiliates. Millions of dollars were transferred for improper and corrupt purposes to Madison-managed entities and related parties of the BCI Principals.

151.    In total, Madison suffered losses of at least $60 million from fraudulent trading activity and transfers that misappropriated funds and has received more than $200 million in liquidation claims resulting from the carrying on of its business in a fraudulent manner to which Deutsche was a knowing participant.

## COUNT ONE: FRAUDULENT TRADING
(Cayman Islands Companies Act § 147)

152.    Plaintiffs repeat and re-allege all of the allegations set forth in the preceding paragraphs of the Complaint as if fully set forth herein.

153.    Trujillo managed Madison with the intent to defraud its creditors and engage in fraudulent trading activity at the direction of the BCI Principals and Haberer. In particular, Trujillo: (1) executed the sales of investments knowing that the real estate projects purportedly being funded were insolvent and had no reasonable prospect of generating returns; (2) created false and fraudulent bank statements to show that the clients' funds were safely invested in the various funds; and (3) made purported interest payments to clients so the clients would believe that their investments were generating returns when, in fact, they were not.

154.    Deutsche knowingly was a party to the carrying on of Madison's fraudulent business. As set forth above, Deutsche facilitated the transfers from Madison and substantially assisted Trujillo in his actions taken with an intent to defraud Madison's creditors and with fraudulent purposes. As described, Deutsche knew, among other things, that: (1) the Madison custody accounts were not being used as contemplated by the Custody Agreement; (2) the funds in the Madison custody accounts were not used in a manner consistent with the offering memoranda; (3) of the Madison accounts and subaccounts for which it had information, the owners and managers were ultimately (either directly or indirectly) ███████████████████ ██████ (4) the SEC issued a Cease-and-Desist consent order to RG Cortes, Weisson, and JC Cortes for willful violations of U.S. Securities laws and placed those individuals under sanctions that barred them from association with any broker, dealer, investment advisor, or transfer agent; and (5) RG Cortes, Weisson, and JC Cortes were using the Biscayne Group of Companies to fund

a failing enterprise, and that the funds to do so were obtained from investors through deceit, misrepresentations and omissions. Yet, Deutsche continued to process transfers among the Biscayne Group of Companies alongside other outgoing transfers from Madison's custody accounts, including subaccounts for entities named in the SEC Order.

155.    Pursuant to Section 147 of the Cayman Islands Companies Act (2012 Revision, as amended), the court may declare that Deutsche is "liable to make such contributions" to Madison "as the Court thinks proper." Deutsche was a knowing participant in the fraudulent trading scheme perpetrated at Madison that facilitated transfers made with the intent to defraud the Madison's creditors and to carry on Madison's business with a fraudulent purpose by using cash from its accounts held at Deutsche for misappropriations and to perpetuate a fraudulent scheme. As a result, Deutsche should be required to make a contribution to Madison in an amount equal to the loss that it suffered through the carrying on of its business in a fraudulent manner, at least $200 million.

## V.    NOTICE OF INTENT TO RAISE ISSUES UNDER FOREIGN LAW

156.    Pursuant to Rule 44.1 of the Federal Rules of Civil Procedure, the JOLs hereby give notice of their intent to raise issues under Cayman Islands law, including but not limited to, their claim for Madison carrying their business with the intent to defraud creditors with a fraudulent purpose pursuant to Section 147 of Cayman Companies Act. The JOLs intend to offer expert testimony, documents, and other relevant material or sources to the Court to determine the foreign law at issue.

## VI.  <u>JURY DEMAND</u>

157.    Plaintiffs demand a jury trial on all contested issues of fact.

## VII.  <u>RELIEF REQUESTED</u>

WHEREFORE, Plaintiffs respectfully request that a judgment be entered on their behalf against Defendant for the following:

      a.  A contribution to Madison pursuant to Section 147 of the Cayman Islands Companies Act;

      b.  Pre-judgment and post-judgment interest at the highest rate allowed by law; and

      c.  Any and all such further relief to which Plaintiffs are entitled at law and in equity.

Dated: May 19, 2021
New York, New York

**REID COLLINS & TSAI LLP**

/s/ *Jeffrey E. Gross*
Jeffrey E. Gross
P. Jason Collins
Vincenzo Novelli
330 West 58th Street, Suite 403
New York, NY 10019
Tel.: 212.344.5200
jgross@reidcollins.com
jcollins@reidcollins.com
vnovelli@reidcollins.com

Jordan L. Vimont, Sr. (*pro hac vice*)
1301 S. Capital of Texas Hwy
Building C, Suite 300
Austin, Texas 78746
Tel.: 512.647.6100
jvimont@reidcollins.com

*Counsel to Plaintiffs*