UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__3/30/2022___
```

MARTIN NICHOLAS JOHN TROTT and
CHRISTOPHER JAMES SMITH, on behalf of and
solely in their capacity as the Foreign Representatives
and Joint Official Liquidators of MADISON ASSET
LLC (IN LIQUIDATION),

                Plaintiffs,

          -against-

DEUTSCHE BANK AG,

                Defendant.

1:20-cv-10299 (MKV)

**OPINION AND ORDER
DENYING MOTION TO DISMISS**

MARY KAY VYSKOCIL, United States District Judge:

       Plaintiffs Martin Nicholas John Trott and Christopher James Smith ("Plaintiffs" or the

"Joint Liquidators"), solely in their capacity as the Foreign Representatives and Joint Official

Liquidators of Madison Asset LLC ("Madison"), a Cayman investment fund that is now in

official liquidation proceedings before the Grand Court of the Cayman Islands, bring claims

against Deutsche Bank AG ("Deutsche Bank" or "Defendant") for fraudulent trading under

section 147 of the Cayman Islands Companies Act (2021 Revision) (the "Companies Act").

(Second Amended Complaint ("SAC") [ECF No. 37]).  This Matter comes before the Court on

the Motion [ECF No. 44] of Deutsche Bank to dismiss the SAC.  For the following reasons,

Deutsche Bank's Motion to Dismiss is denied.

## I.    FACTUAL BACKGROUND

### A.  The Biscayne Group Of Companies

       Beginning in 2008, Deutsche Bank provided custody banking services to Biscayne

Capital International, LLC ("BCI"), a Miami investment advisory firm whose principals were

Roberto G. Cortes, Juan C. Cortes, and Ernesto H. Weisson (the "BCI Principals").  (SAC ¶¶ 20–

21).[1]   The BCI Principals operated BCI with their associate, Gustavo Trujillo, and financial advisor Fernando Haberer Bergson.  (SAC ¶¶ 15–20, 53).  BCI and the related firms raised money for the BCI Principals' real estate venture, South Bay Holdings, LLC ("South Bay"). (SAC ¶¶ 17–18).  The BCI Principals formed several special purpose vehicles ("SPVs") that issued debt securities to fund South Bay.  (SAC ¶¶ 22–23).  Deutsche Bank held cash and securities and provided clearing services for BCI and the SPVs. (SAC ¶ 21).

In 2009, South Bay became financially distressed and the BCI Principals expanded their debt program by making offerings from new and existing SPVs.  (SAC ¶¶ 30–31).  The BCI Principals and their financial advisors placed client funds in these offerings, but then diverted most of the funds either into the personal accounts of the BCI Principals, to repay older investors, or to fund other illegal activities.  (SAC ¶¶ 25, 32, 85, 147).

In addition, Deutsche Bank assisted the BCI Principals in preparation for new offerings of Preferred Debt, including by reviewing advance copies of the Preferred SPVs and providing comments.  (SAC ¶¶ 43–44).  Deutsche Bank also disseminated offering memoranda to investors.  (SAC ¶¶ 43–44).  For the issuances of Preferred Debt, the SPVs utilized Deutsche Bank and its Luxembourg affiliate to perform administrative tasks in the roles of Issuing Agent, Principal Paying Agent, Transfer Agent, and/or Registrar.  (SAC ¶¶ 36, 41).  Deutsche Bank distributed and collected certificates (SAC ¶ 38), made periodic payments (SAC ¶ 39), and performed record keeping (SAC ¶¶ 40-41).

Deutsche Bank assisted the BCI Principals in preparing the offering memoranda for several of the Preferred SPVs.  (SAC ¶¶ 43–44).  In many of these memoranda, the "Conflicts of

---

[1] Unless otherwise noted, the facts are taken from the SAC, and are accepted as true for the purposes of this motion. *See, e.g., Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  However, this Court need not "accept as true all of the [legal conclusions] contained in a complaint."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Interest" section disclosed that the Preferred SPV was owned by the BCI Principals and that the Preferred SPV would primarily invest in South Bay, which was also partially owned by the BCI Principals, though in at least one offering this was not disclosed.  (SAC ¶¶ 44–45).  Plaintiff alleges that "[i]ndividuals throughout Deutsche Bank's organization were aware of this self-dealing."  (SAC ¶ 47).

### B.  The BCI Principals Form Madison

When the Securities and Exchange Commission (the "SEC") began an examination of BCI and its affiliates in 2012, the BCI Principals moved many of their investment activities offshore to avoid the SEC's jurisdiction.  (SAC ¶¶ 48–50).  In 2014, the SEC launched a formal investigation into the activities of BCI, the BCI Principals, and several of the Preferred SPVs, which led the BCI Principals to restructure the vehicles through which they operated their scheme.  (SAC ¶ 51).  Most notably, the BCI Principals formed Madison, a new entity domiciled in the Cayman Islands.  (SAC ¶ 52).  Madison was created purportedly as another financial services company that served as a broker and investment advisor for the Biscayne Group of Companies.  (SAC ¶ 52).

Shortly after forming Madison, the BCI Principals selected Mr. Trujillo to manage its operations.  (SAC ¶ 53).  Mr. Trujillo and Mr. Haberer worked with Floris Vreedenburgh, their contact at Deutsche Bank who worked out of its New York branch, to establish custody and banking services for Madison.  (SAC ¶ 55).  Ms. Vreedenburgh knew that Madison was related to BCI.  (SAC ¶ 55; Pl. Opp'n Ex. 3).

In March 2014, Ms. Vreedenburgh had a meeting with Mr. Haberer in which he shared the plan to have Madison serve as the primary investment advisor and broker for the Preferred SPVs and other affiliates of the BCI Principals.  (SAC ¶ 56).  Ms. Vreedenburgh advised that

Deutsche Bank would allow Madison to set up a primary custody account and Madison could then establish separate custody accounts for the Preferred SPVs and its other "clients."  (SAC ¶ 56).  Ms. Vreedenburgh explained that Deutsche Bank would need to perform its own due diligence on any third parties for whom Madison sought to set up custody accounts, but that if Madison established the accounts for the Preferred SPVs as "subaccounts" under Madison's own name, the onboarding due diligence process could be circumvented.  (SAC ¶¶ 56, 59–60).  Plaintiffs allege that this setup allowed "Madison to process what would otherwise appear as suspicious cash transfers under the guise of legitimate securities settlement activity."  (SAC ¶ 57).

Mr. Trujillo subsequently emailed Ms. Vreedenburgh to open a custody account for Madison.  (SAC ¶ 63).  Ms. Vreedenburgh confirmed that she knew that Madison was related to the Biscayne group.  (SAC ¶¶ 62–63).  Mr. Trujillo instructed Ms. Vreedenburgh to open subaccounts under Madison for the Preferred SPVs, per Ms. Vreedenburgh's recommendations.  (SAC ¶¶ 58, 64).  A few days later, Deutsche Bank and Madison executed a Multi Market Custody Agreement, (SAC ¶ 66, Ex. A (the "Custody Agreement")), with an E-Mail Addendum, (SAC ¶ 66, Ex. B (the "Addendum")).  Deutsche Bank also set up subaccounts for each of the Preferred SPVs, for which it did not undertake separate onboarding or due diligence.  (SAC ¶ 71, Ex. C).

## C.  The BCI Principals Run Their Fraud Through Madison

Plaintiffs allege that the only legitimate purpose for custody accounts is to process securities transactions.  (SAC ¶ 67).  Nonetheless, the Madison accounts processed hundreds of transfers, worth millions of dollars, that Plaintiffs allege were clearly unrelated to securities

transactions.  (SAC ¶¶ 89–90, 93, 95–96, 103, 122, 150).  These transfers included payments of credit card bills and wires to the BCI Principals or their holding companies. (SAC ¶¶ 89, 122).

On January 19, 2016, Scott Habura, another employee of Deutsche Bank, emailed Mr. Trujillo that Deutsche Bank's operations team brought to his attention "the number of wires and the hundreds of beneficiaries for [] Madison . . . , that these wires were going out to" and that Deutsche Bank concluded that most of these wires were not related to the custody activity in the accounts.  (SAC ¶ 92; Pl. Opp'n Ex. 6).  Mr. Habura asked Mr. Trujillo to move the activity "to a cash account outside of Deutsche Bank's custody environment."  (SAC ¶ 97; Pl. Opp'n Ex. 6). He advised Mr. Trujillo that Deutsche Bank would "be able to facilitate wires to [Madison's] bank account or to other financial counterparties, but [Deutsche Bank] will not be able to send out third-party wires."  (SAC ¶ 97; Pl. Opp'n Ex. 6).  A few weeks later, after the activity continued, Patrick Hannon, from the operations team at Deutsche Bank, followed up, asking for an update and advising Mr. Trujillo that Deutsche Bank "shouldn't continue to process such activity unrelated to trade settlement."  (SAC ¶¶ 103–04; Pl. Opp'n Ex. 6).  About two weeks after that email, the activity continued, and Mr. Habura emailed Mr. Trujillo to advise him that the issue "ha[d] been flagged by [Deutsche Bank's] risk and compliance group and beginning today [Deutsche Bank] can no longer process these types of wires that are unrelated to [Madison's] securities activity."  (SAC ¶ 108; Pl. Opp'n Ex. 6).

Around the same time, Deutsche Bank also communicated with Mr. Trujillo about repeated overdrafts by Madison.  (SAC ¶¶ 109–16; Pl. Opp'n Ex. 6).  Because Madison's custody account was designed for settling securities transactions, Plaintiffs allege that there was no legitimate reason for the account to be routinely or even occasionally in overdraft.  (SAC ¶ 110).  Nonetheless, over the course of about two weeks in 2016, Mr. Habura emailed Mr.

Trujillo to warn him that the account overdrafts in the Madison Custody Account were being evaluated and that if they were not cleared, Deutsche Bank may need to close its relationship with Madison.  (SAC ¶¶ 111–116; Pl. Opp'n Ex. 6).  When Mr. Trujillo failed to remedy Madison's overdrafts, Deutsche Bank placed a hold on its account.  (SAC ¶¶ 111–116; Pl. Opp'n Ex. 6).

Notwithstanding Mr. Habura's email, Deutsche Bank continued to process Madison's non-securities related wire activity.  (SAC ¶¶ 121–24).  By May 2016, Deutsche Bank's operations group was circulating daily reports about wire activity for both Madison and Biscayne Bahamas (another entity in the Biscayne Group of Companies).  (SAC ¶¶ 121–24).  Mr. Habura forwarded to Mr. Trujillo internal Deutsche Bank emails about the wrongful activity and advised Mr. Trujillo that "compliance will be stepping in and halting this activity."  (SAC ¶¶ 125–26; Pl. Opp'n Ex. 8).

While Deutsche Bank was communicating with Mr. Trujillo about the activity in Madison's account, Mr. Trujillo was trying to open a new cash account in another bank, from which to facilitate his improper transfers.  (SAC ¶ 105).  Mr. Habura wrote a letter of reference to Credicorp Bank on behalf of Madison, in which Mr Habura wrote of the "good business relationship" between Madison and Deutsche Bank.  (SAC ¶ 105).  Plaintiffs allege that this letter was improper because it "effectively cover[ed] for a client whose activity had caused such persistent problems that Deutsche Bank's operations group was privately threatening to severely restrict the activity in the account."  (SAC ¶ 105).  Plaintiffs allege that Mr. Habura recommended that Mr. Trujillo move his activity to a cash account outside of Deutsche Bank's custody environment and wrote the letter of recommendation in order to allow Deutsche Bank to

continue to profit from Madison while at the same time averting an investigation by Deutsche Bank that would uncover the true illicit nature of Madison's business.  (SAC ¶ 106).

During this same time period in early 2016, Ms. Vreedenburgh also agreed to set up a meeting with a concerned individual who had invested with the Biscayne Principals and wanted assurances at an in-person meeting with Deutsche Bank regarding Madison's relationship with Deutsche Bank.  (SAC ¶¶ 118–19).

### D.  SEC Order

On May 26, 2016, the SEC entered and published a consent order (the "SEC Order"). (SAC ¶ 129, Ex. E).  The SEC Order described securities law violations by BCI and the BCI Principals stemming from: (1) failing to disclose conflicts of interests to clients and investors; (2) making omissions and misrepresentations about the ownership, financial performance, and prospects of some SPVs to investors; and (3) using the SPVs to fund the failing South Bay without full disclosure.  (SAC ¶¶ 129–30, Ex. E).  The SEC Order stated that these acts and failures constituted willful violations of Sections 206 and 207 of the Advisers Act, and as such, operated as fraud and deceit on BCI's investors in the SPVs.  (SAC ¶¶ 129–30, Ex. E).

Subsequent to the issuance of the SEC Order, Deutsche Bank closed certain accounts held by affiliates of the Biscayne Group of Companies but did not close the Madison account. (SAC ¶ 138).  In late 2016 and early 2017, Deutsche Bank compliance and anti-money laundering personnel made additional requests to Mr. Trujillo for information on the Madison-managed entities and related account activity, but received inadequate responses.  (SAC ¶ 143). On June 15, 2017, Deutsche Bank provided notice to Madison that it was terminating the Custody Agreement effective August 31, 2017 and closing Madison's cash and custody accounts after the termination date.  (SAC ¶ 144, Ex. F).

## II.   <u>PROCEDURAL HISTORY</u>

In July 2018, the Grand Court of the Cayman Islands ordered that Madison be wound up under the terms of the Companies Act and appointed Plaintiffs Martin Nicholas John Trott and Christopher James Smith as Joint Liquidators.  (SAC ¶ 6).  Thereafter, the Joint Liquidators filed a Chapter 15 Petition for Recognition of a Foreign Proceeding in the United States Bankruptcy Court for the Southern District of New York.  Chapter 15 Petition for Recognition of a Foreign Proceeding, Dkt. No. 1, *In re Madison Asset, LLC*, No. 18-12814 (MEW) (Bankr. S.D.N.Y. Sept. 18, 2018).  Recognition was granted by the Bankruptcy Court as a foreign main proceeding. Order Granting Recognition, Dkt. No. 15, *In re Madison Asset, LLC*, No. 18-12814 (MEW) (Bankr. S.D.N.Y. Oct. 16, 2018).  About two years later, the Joint Liquidators brought an adversary proceeding against Deutsche Bank for fraudulent trading under section 147 of the Companies Act.  Complaint, Dkt. No. 25, *In re Madison Asset, LLC*, No. 18-12814 (MEW) (Bankr. S.D.N.Y. Oct. 14, 2020).

A few months after Plaintiffs commenced the adversary proceeding, Deutsche Bank filed an unopposed motion in this Court to withdraw the bankruptcy reference, [ECF Nos. 1, 12], which the Court granted, [ECF No. 13].  Plaintiff filed a First Amended Complaint, [ECF No. 17], and then, with leave of the Court, [ECF No. 32], filed the SAC.

Deutsche Bank now moves to dismiss the SAC.  [ECF No. 44].  In support of its Motion, Deutsche Bank filed a memorandum of law, (Def. Br. [ECF No. 45]), the Declaration of David G. Januszewski, counsel to Deutsche Bank, with several exhibits, (Januszewski Decl. [ECF No. 46]), and the Declaration of Rupert Geoffrey Dangar Bell, Deutsche Bank's expert in Cayman Islands law, with copies of statutes and cases, (Bell Decl. [ECF No. 47]).  In opposition to Deutsche Bank's Motion, Plaintiffs filed a memorandum of law, (Pl. Opp'n [ECF No. 52]), and

the Declaration of Graeme Alexander Halkerston, Plaintiff's expert in Cayman Islands law, with copies of statutes and cases, (Halkerston Decl. [ECF No. 53]).  Deutsche Bank filed a reply, (Def. Reply [ECF No. 54]), and a supplemental Declaration of Rupert Geoffrey Dangar Bell, (Bell Supp. Decl. [ECF No. 55]).

## LEGAL STANDARDS

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of [her] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (alterations, internal quotation marks, and citations omitted).

In reviewing a motion to dismiss for failure to state a claim upon which relief can be granted, we accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party.  *Hernandez v. United States*, 939 F.3d 191, 198 (2d Cir. 2019).  The Court may consider "the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010)  For documents to be incorporated by reference, the complaint must make "a clear, definite and substantial reference to the

documents." *Jones-Cruz v. Rivera*, No. 19 CIV. 6910 (PGG), 2021 WL 965036, at *3 (S.D.N.Y.

Mar. 14, 2021) (quoting *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010).

### III.   <u>DISCUSSION</u>

Plaintiffs assert a single claim against Deutsche Bank for fraudulent trading under section

147 of the Companies Act, which provides:

> (1) If in the course of the winding up of a company it appears that any business of the company has been carried on with intent to defraud creditors of the company or creditors of any other person or for any fraudulent purpose the liquidator may apply to the Court for a declaration under this section.

> (2) The Court may declare that any persons who were knowingly parties to the carrying on of the business in the manner mentioned in subsection (1) are liable to make such contributions, if any, to the company's assets as the Court thinks proper.

(Bell Decl. Ex. A).  Plaintiffs seek contribution from Deutsche Bank to the bankruptcy estate or

Madison pursuant to section 147 of the Companies Act.  (SAC, Relief Requested).

#### A.  The Court Must Apply Cayman Islands law

The Court must first determine whether Cayman Islands law or New York law governs

Plaintiffs' claim.  Deutsche Bank asserts that there is a conflict between Cayman Islands law and

New York law, and that therefore, the Court must apply an interest analysis under New York

State law to determine what law applies.  (Def. Br. 9–11).  Based on this analysis, Deutsche

Bank asserts, New York State law applies to Plaintiffs' claim.  (Def. Br. 9–11).  Deutsche Bank

concedes that no New York statute directly corresponds to Plaintiffs' asserted statutory cause of

action, but nonetheless urges the Court to instead treat Plaintiffs' section 147 claim as a New

York common law aiding and abetting fraud claim because the two claims "mirror" one another. (Def. Br. 9).

The Court will not apply New York law to Plaintiffs' cause of action.  As a preliminary matter, the federal policy interests of comity and cooperation underlying Chapter 15 strongly support application of Cayman law to Plaintiffs' section 147 claim.  "[O]ne of the main purposes of chapter 15 is to assist a foreign representative in the administration of the foreign estate."  *In re China Med. Techs., Inc.*, 539 B.R. 643, 649 (S.D.N.Y. 2015) (quoting *In re Millennium Glob. Emerging Credit Master Fund Ltd.*, 471 B.R. 342, 347 (Bankr. S.D.N.Y. 2012)).  As such, "[a] central tenet of chapter 15 is the importance of comity in cross-border insolvency proceedings." *In re Rede Energia S.A.*, 515 B.R. 69, 89 (Bankr. S.D.N.Y. 2014) (quoting *In re Cozumel Caribe, S.A. de C.V.*, 482 B.R. 96, 114–15 (Bankr. S.D.N.Y. 2012)).  Pursuant to section 1509 of the Bankruptcy Code, if the Court grants recognition to a foreign proceeding, as is the case here, the preferred course is to "grant comity or cooperation to the foreign representative."  11 U.S.C. § 1509(b)(3); *In re Agrokor d.d.*, 591 B.R. 163, 186 (Bankr. S.D.N.Y. 2018) ("Once a case is recognized as a foreign main proceeding . . . Chapter 15 specifically contemplates that the court will exercise its discretion consistent with principles of comity."); R*oyal & Sun All. Ins. Co. of Canada v. Century Int'l Arms, Inc.*, 466 F.3d 88, 94 (2d Cir. 2006) ("In the context of parallel proceedings in a foreign court, a district court should be guided by the principles upon which international comity is based: the proper respect for litigation in and the courts of a sovereign nation, fairness to litigants, and judicial efficiency.").  Chapter 15 only provides for an exception to comity where it "would be manifestly contrary to the public policy of the United States," 11 U.S.C. § 1506, which is not the case here.  Though district courts have discretion to deny

granting comity to foreign laws "when unique circumstances warrant it," "it is well recognized that comity should be extended in most instances." *In re Cozumel Caribe*, 482 B.R. at 113.

Comity is especially warranted here where the liquidation proceeding is being conducted in the Cayman Islands and has been granted recognition here, and Plaintiffs assert a claim under a Cayman Islands statute. Deutsche Bank's insistence that the Court can somehow transform Plaintiffs' Cayman Islands statutory claim into a different New York common law claim is perplexing. Deutsche Bank merely cites to only one case to support its contention that these two different claims can be substituted for one another: *In re ICP Strategic Credit Income Fund Ltd.*, No. 13-12116 (REG), 2015 WL 5404880 (Bankr. S.D.N.Y. Sept. 15, 2015), *aff'd*, 568 B.R. 596 (S.D.N.Y. 2017), *aff'd sub nom. In re ICP Strategic Income Fund, Ltd.*, 730 F. App'x 78 (2d Cir. 2018). However, the Bankruptcy Court in *In re ICP Strategic Credit Income Fund* acknowledged that, although the two claims have overlapping requirements, they are not identical. *Id.* at *17. Moreover, the Bankruptcy Court in *In re ICP Strategic Credit Income Fund* dismissed the plaintiffs' section 147 claim, concluding that there was no underlying fraud from which to assert such a claim in the first instance. *Id.* at *16–17. Conversely, here, Deutsche Bank concedes that there was an underlying fraud, but argues that this case turns on Deutsche Bank's knowledge of that fraud and its involvement in the carrying on of that fraud. *See infra* Part III.B.2.

Of significance as well, Deutsche Bank's contradictory assertions in its brief further support that the Court should not substitute a different New York common law claim for Plaintiffs' Cayman Islands statutory claim. Deutsche Bank asserts that such a substitution is appropriate because the two claims "mirror" one another. (Def. Br. 9.) Yet, Deutsche Bank then proceeds to argue that the Court should assume a conflict between New York and Cayman

Islands law because section 147 claims are unsettled and have yet to be applied or interpreted by any Cayman Islands court.  (Def. Br. 9).  Deutsche Bank cannot plausibly suggest that a section 147 claim under the Companies Act and a New York common law claim for aiding and abetting fraud are so similar that they can be substituted for one another, but in the next breath urge the Court to assume a conflict between those same causes of action.  As such, the Court declines Deutsche Bank's request for the Court to essentially reshape Plaintiffs' cause of action.  The Court will instead evaluate the claim Plaintiffs filed — a Cayman Islands statutory claim under Cayman Islands law.

### B.  Section 147 Of The Companies Act

#### 1.  Applying Foreign Law

Federal Rule of Civil Procedure 44.1 gives the Court discretion in interpreting foreign law.  The court may "consider any relevant material or source . . . whether or not submitted by a party or admissible under the Federal Rules of Evidence."  Fed. R. Civ. P. 44.1.  "Because of this latitude, a court may reject even uncontradicted expert testimony and reach its own decisions on the basis of [an] independent examination of foreign legal authorities."  *Abdelhamid v. Altria Grp., Inc.*, 515 F. Supp. 2d 384, 395 n.60 (S.D.N.Y. 2007) (quoting *Guidi v. Inter–Continental Hotels Corp.*, No. 95 Civ. 9006, 2003 WL 1907901, at *2 (S.D.N.Y. Apr. 16, 2003)).

Here, submissions on the contours of relevant foreign law were provided in the declarations of Rupert Geoffrey Dangar Bell (Deutsche Bank's expert) and Graeme Alexander Halkerston (the Joint Liquidators' expert) in connection with the motions to dismiss.  (*See* Bell Decl.; Halkerston Decl.).  Both experts agree that in the absence of reported Cayman decisions, decisions of the courts of England and Wales are regarded as being of persuasive authority in the courts of the Cayman Islands.  (Bell Dec. ¶ 10; Halkerston Decl. ¶ 10).

2.  *Plaintiffs' Section 147 Claim Under The Companies Act*

Both experts also agree that to adequately state a claim for fraudulent trading under section 147, Plaintiffs must allege that: (1) some business of Madison "has been carried on with intent to defraud creditors of the company . . . or for any fraudulent purpose," (2) Deutsche Bank was a "part[y] to the carrying on of the business" for such fraudulent purpose, and (3) Deutsche Bank's participation in carrying on the fraud was "knowing."  (Bell Decl. ¶ 11, Ex. A (The Companies Act); Halkerston Decl. ¶ 18, Ex. A (The Companies Act)).  Both parties also agree that English cases interpreting Section 213 of the English Insolvency Act are instructive because that statute is nearly identical to section 147 of the Companies Act.  (Bell Decl. at ¶¶ 13–14; Halkerston Decl. ¶¶ 22–23).

Because Plaintiffs' allegations are premised on an underlying claim of fraud, the heightened pleading standards of Rule 9(b) apply to Plaintiffs' claims.  *See Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006) (holding that Rule 9(b) applies to a claim that defendants had "actual knowledge of fraud"); *Aurelius Cap. Master, Ltd. v. Republic of Argentina*, No. 19 CIV. 10109 (LAP), 2021 WL 1177465, at *6 (S.D.N.Y. Mar. 29, 2021) (holding that Rule 9(b) applies "to any cause of action that bears a close legal relationship to fraud or mistake" (citation omitted)).[2]  Pursuant to Rule 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).

Deutsche Bank does not contest that Plaintiffs have adequately pleaded that Madison was carried on for a fraudulent purpose.  Instead, Deutsche Bank contests whether Plaintiffs have

---

[2] "[I]t is a well-settled conflict-of-laws rule that the forum will apply the foreign substantive law, but will follow its own rules of procedure."  *Bakalar v. Vavra*, 550 F. Supp. 2d 548, 551 (S.D.N.Y. 2008) (quoting *Bournias v. Atlantic Maritime Co.*, 220 F.2d 152, 154 (2d Cir.1955)).

adequately pleaded the second two elements of a section 147 claim, specifically that Deutsche

Bank was a participant in the carrying on of fraud and that any participation in a fraud was

knowing.  (Def. Br. 20–25).

### a. Deutsche Bank Was A Party To The Carrying On Of Madison's Fraudulent Business

Deutsche Bank challenges whether the SAC sufficiently alleges that it participated in the

"carrying on" of Madison's fraudulent business.  (Def. Br. 24).  As a preliminary matter

however, the parties disagree over what legal standard should apply to this element of a section

147 claim.  Deutsche Bank's expert, Mr. Bell, contends that to sufficiently plead that Deutsche

Bank was a party to the carrying on of the business for a fraudulent purpose, Plaintiffs must

allege that Deutsche Bank took "some positive steps in the carrying on of the business as

prescribed."  (Bell Decl. ¶¶ 18–19, Ex. F (*In re Maidstone Buildings Provisions Ltd* 1971 1 WLR

1085); Def. Br. 18).  Deutsche Bank argues that allegations that Deutsche Bank made mere

"omissions" or participated in "*bona fide* business transactions" would be insufficient to plead a

section 147 claim under the Companies Act.  (Bell Decl. ¶¶ 18–19, Ex. F (*In re Maidstone

Buildings Provisions Ltd* 1971 1 WLR 1085); Def. Br. 18).  By contrast, Plaintiffs' expert, Mr.

Halkerston, contends that the "threshold for 'participation' is a low one," and encompasses

routine banking activities.  (Halkerston Decl. ¶¶ 45–46).  Mr. Halkerston claims that Mr. Bell's

legal conclusion is derived from an "outlier" decision that had "extreme facts" and involved

criminal liability.  (Halkerston Decl. ¶¶ 60–61).  The Court need not resolve this since, even

accepting the interpretation of Cayman Islands law from Deutsche Bank's expert, the SAC

sufficiently pleads that Deutsche Bank took at least some positive steps in the carrying on of Madison's fraud.

The SAC alleges that, from the start of Madison's banking relationship with Deutsche Bank, Deutsche Bank took affirmative steps that furthered Madison's fraudulent conduct.  First, the SAC alleges that Deutsche Bank worked with Madison to structure its account to circumvent Deutsche Bank's due diligence requirements.  (SAC ¶¶ 56, 59–60).  The SAC also alleges that the assistance of Ms. Vreedenburgh and Mr. Habura to establish the subaccounts for the Preferred SPVs was not permitted by any Deutsche Bank policy or procedure.  (SAC ¶ 61).  Plaintiffs allege that structuring the Madison account in this manner allowed Madison to maintain its fraudulent scheme.  (SAC ¶ 71).

The SAC also includes other allegations of actions that Deutsche Bank took to participate in the "carrying on" of Madison's fraudulent scheme.  This includes allegations that Mr. Habura wrote a letter of reference to assist Madison in opening a new bank account, (SAC ¶ 105), and that Ms. Vreedenburgh agreed to set up a meeting with a concerned individual who had invested with the Biscayne Principals and wanted assurances at an in-person meeting with Deutsche Bank regarding Madison's relationship with Deutsche Bank, (SAC ¶¶ 118–19).

Deutsche Bank attempts to characterize these alleged actions as "ministerial" and as "ordinary banking services."  (Def. Br. 24–25).  However, on a Motion to Dismiss, the Court must "accept as true all factual allegations and draw from them all reasonable inferences" in Plaintiffs' favor.  *Hernandez*, 939 F.3d at 198 (citation omitted).  Plaintiffs' SAC pleads sufficient factual allegations from which to reasonably infer that Deutsche Bank took at least some positive steps in the carrying on of Madison's alleged fraudulent business.

### b. Plaintiffs Sufficiently Allege Deutsche Bank's
### Knowledge Of Madison's Fraud

It is undisputed that to establish that Deutsche Bank was "knowing[ly]," a party to the carrying on of Madison's fraud, Plaintiff must plead either actual knowledge of the fraud or "wilful blindness" on the part of Deutsche Bank.  (Bell Decl. ¶ 21; Halkerston Decl. ¶ 77).  The Joint Liquidators do not allege that Deutsche Bank had actual knowledge of Madison's fraud. Instead, they charge that Deutsche Bank was willfully blind to Madison's fraudulent business. (Pl. Opp'n 19).  Wrongful knowledge can exist even if a defendant does not know the details of the fraud.  (Halkerston Decl. ¶¶ 74, 76, Ex. Z (*Bilta (UK) v NatWest Markets and Mercuria* [2020] EWHC 546(Ch) at [229])).

The parties agree that wilful blindness is established when a party has suspicion of an underlying fraud and makes a conscious decision not to make inquiries which might result in actual knowledge of those facts.  (Bell Decl. ¶ 23(b), Ex. I (*Manifest Shipping Co Ltd v Uni-Polaris Co Ltd* [2003] 1 AC 469 ("blind-eye knowledge requires . . . a suspicion that the relevant facts do exist and a deliberate decision to avoid confirming that they exist.")); Halkerston Decl. ¶¶ 73, 78).  Nonetheless, a plaintiff must show more than even "gross" negligence on the part of the defendant.  (Bell Decl. ¶ 23(b), Ex. I (*Manifest Shipping Co Ltd v Uni-Polaris Co Ltd* [2003] 1 AC 469); Halkerston Dec. ¶ 81).  Plaintiffs must plead that a defendant's suspicion in an underlying fraud was "firmly grounded and targeted on specific facts, and the deliberate decision not to ask questions must be a decision to avoid obtaining confirmation of facts in whose existence the individual has good reason to believe."  (Halkerston Dec. ¶ 82, Ex. AA (*Stanford International Bank Ltd v HSBC Bank Plc* [2021] EWCA Civ 535; [2021] 1 WLR 3507, at [41]); *see also* Bell Dec. ¶ 23(a), Ex. E (*Morris v State Bank of India* [2003] EWHC 1868 (Ch) ("It is well established that it is no defence to say that one declined to ask questions, when the only

17

reason for not doing so was an actual appreciation that the answers to those questions would be likely to disclose the existence of a fraud.  But liability in such cases depends upon that stage of consciousness having been reached.")).

Examining the totality of the allegations in the SAC and drawing all reasonable inferences in Plaintiffs' favor, *see Hernandez*, 939 F.3d at 198, Plaintiffs have plead sufficient factual allegations from which to draw the reasonable inference that Deutsche Bank was "knowingly" a party to the carrying on of Madison's fraud.

Plaintiffs plead facts to support a reasonable inference that Deutsche Bank had "blind-eye" knowledge of Madison's fraudulent business as early as March 2014.  The SAC alleges that, before the BCI Principals established Madison, Deutsche Bank was already aware of self-dealing in the Preferred SPVs.  (SAC ¶¶ 43–45, 47).  Specifically, Deutsche Bank assisted the BCI Principals in preparing the offering memoranda for several of the Preferred SPVs.  (SAC ¶¶ 43–44).  These offering memoranda disclosed that several of the Preferred SPVs were owned by the BCI Principals and that these Preferred SPVs would primarily invest in South Bay, which was also partially owned by the BCI Principals.  (SAC ¶¶ 44–45).  Accordingly, the SAC alleges that "[i]ndividuals throughout Deutsche Bank's organization were aware of this self-dealing." (SAC ¶ 47).

Despite the knowledge that the BCI Principals were engaged in self-dealing through the Preferred SPVs, Deutsche Bank specifically advised Mr. Haberer and Mr. Trujillo how to structure the Madison Custody Account so as to avoid scrutiny into the Preferred SPVs.  The SAC alleges that, in March 2014, Ms. Vreedenburgh met with Mr. Haberer and advised him on how to set up "subaccounts" for the Preferred SPVs under Madison's Custody Account, which would allow Madison to circumvent Deutsche Bank's due diligence procedures.  (SAC ¶¶ 56,

59–60).  By structuring the Madison Custody Account in this manner, the BCI Principals were

able to use Deutsche Bank to process millions in cash transfers to perpetuate their fraudulent

scheme while avoiding external oversight.  (SAC ¶¶ 57–58).  Plaintiffs' specific allegations

regarding Ms. Vreedenburgh's advise on how to structure the "subaccounts" for the Preferred

SPVs plausibly supports an inference that she, at a minimum, turned a blind-eye to Madison's

fraudulent business.

The SAC also alleges sufficient facts to support a reasonable inference that Deutsche

Bank had "blind-eye" knowledge of Madison's fraudulent business when Deutsche Bank

contacted Mr. Trujillo about significant wire activity in the Madison custody account that,

Plaintiffs allege, was clearly unrelated to custody securities transactions.  (SAC ¶¶ 89–90, 145).

The SAC alleges that the Madison account processed hundreds of transfers, worth millions of

dollars, that Plaintiffs allege were clearly unrelated to securities transactions.  (SAC ¶¶ 89–90,

93, 95–96, 103, 122, 150).  These transfers included payments of credit card bills and wires to

the BCI Principals or their holding companies. (SAC ¶¶ 89, 122).

Plaintiffs cite to an email chain between Deutsche Bank and Mr. Trujillo, that is

incorporated in the SAC, which spanned the first two months of 2016.  (SAC ¶¶ 92–97, 103–04,

107–08, 111–16, 121–27; Pl. Opp'n Ex. 6).  In these emails, officials at Deutsche Bank

contacted Mr. Trujillo about wire activity and overdrafts in the Madison account.  (Pl. Opp'n Ex.

6).  Deutsche Bank informed Mr. Trujillo that these transactions could not run through the

Madison Custody Account and that Mr. Trujillo had to route them to a cash account outside of

Deutsche Bank's "custody environment."  (Pl. Opp'n Ex. 6).  Deutsch also advised Mr. Trujillo

that he had to clear the overdrafts in the Madison account.  (Pl. Opp'n Ex. 6).  After Mr. Trujillo

failed to comply with Deutsche Bank's requests, Deutsche Bank placed restrictions on this type

of activity in the Madison Custody Account.  (Pl. Opp'n Ex. 6).  Yet, Deutsche Bank continued

to process Madison's non-securities related wire activity.  (SAC ¶¶ 121–24).  By May 2016,

Deutsche Bank's operations group was circulating daily reports about wire activity for both

Madison and Biscayne Bahamas.  (SAC ¶¶ 121–24).  Mr. Habura forwarded to Mr. Trujillo

internal Deutsche Bank emails about the wrongful activity and advised Mr. Trujillo that

"compliance will be stepping in and halting this activity."  (SAC ¶¶ 125–26; Pl. Opp'n Ex. 8).

Yet, even after all this suspicious activity was flagged, Deutsche Bank continued to process

transactions for Madison in its custody account.  (SAC ¶ 144, Ex. F).  Moreover, Deutsche Bank

never inquired into the reason for these suspicious transactions.  Instead, it merely asked that Mr.

Trujillo move these suspicious transactions to other accounts where they would not be subject to

the scrutiny of Deutsche Bank's compliance department.  (SAC ¶¶ 96–97, 112; Pl. Opp'n Ex. 6).

The SAC alleges that Deutsche Bank, as a policy, did not allow wire activity unrelated to

custody activity in Custody accounts nor did it extend credit services to clients.  (SAC ¶¶ 67–70,

110).  Indeed, Mr. Habura and Ms. Vreedenburgh both testified that the activity discussed in

these 2016 emails was highly suspicious.  (SAC ¶¶ 82, 114; Pl. Opp'n Ex. 1, 184:10–15 (Ms.

Vreedenburgh stating that the overdraft in the Madison Custody Account in early 2016 was a

"very significant red flag"), Ex. 2, 121:9–23 (Mr. Habura testifying that it would not surprise

him that Mr. Trujillo was criminally charged after reviewing the 2016 emails)).  The SAC also

alleges that, on account of a 2015 SEC pronouncement, Deutsche Bank would have been on

notice to be suspicious of "high volume of money movements and atypical wire activity in

custodial securities accounts."  (SAC ¶ 98).  Yet, Deutsche Bank continued to process

transactions for Madison for over a year after it flagged this irregular and suspicious wire

activity.  (SAC ¶ 144, Ex. F).  These detailed allegations, accepted as true, plausibly support an

inference that Deutsche Bank turned a blind eye to suspicious wire activity in the Madison Custody Account.

The SAC also alleges that Deutsche Bank had "blind-eye knowledge" of fraud occurring in the Madison Custody Account in May 2016, more than a year before Deutsche Bank terminated the Custody Agreement, when the SEC Order was published.  (SAC ¶¶ 129, 133, 135, 136–137; Pl. Opp'n Ex. E).  The SAC alleges that the SEC Order described securities law violations by BCI and the BCI Principals and that the acts of the BCI Principals acted as a fraud and deceit on BCI's investors in the SPVs.  (SAC ¶¶ 129–30).  The SAC alleges that Deutsche Bank was aware of the SEC Order, because it responded by closing a set of accounts held by affiliates of the Biscayne Group of Companies.  (SAC ¶ 138).  The SAC also alleges that Deutsche Bank was aware that Madison was related to the BCI Principals and the Biscayne Group of Companies.  (SAC ¶¶ 55, 62–63; Pl. Opp'n Ex. 3).  Accordingly, accepting all the allegations in the SAC as true, and drawing all reasonable inferences in Plaintiffs' favor, the SAC sufficiently alleges facts that plausibly support an inference that Deutsche Bank turned a blind eye to Madison's fraudulent business, even after the SEC Order was published.

Deutsche Bank claims that the SEC Order could not have put Deutsche Bank on notice of possible fraud in the Madison Account because the SEC Order did not describe, in detail, the ponzi scheme perpetrated by the BCI Principals.  (Def. Br. 22).  But the SAC alleges that the SEC detailed its findings that BCI and the BCI Principals, including RG Cortes, Mr. Weisson and JC Cortes, committed multiple violations of the federal securities laws.  (SAC ¶ 129).  The SAC also alleges that, when the Madison Custody Account was established, Deutsche Bank knew that Madison was connected to the BCI companies and the BCI Principals.  (SAC ¶¶ 62–63).  Moreover, under Cayman Islands law, wrongful knowledge exists even if the defendant

does not know the details of the fraud.  (Halkerston Decl. ¶¶ 65, 72-76; *Morris v Bank of India* [2004] EWHC 528 (Ch), BCC 404 ("[BOI] did not have to know every detail of the fraud or the precise mechanics of how it would be carried out . . .").  Accordingly, although Deutsche Bank may not have known the exact details of Madison's fraudulent business, it is enough that the SAC plausibly alleges that Deutsche Bank had a suspicion of fraudulent activity in the Madison Custody Account generally.

Deutsche Bank contends that, even if the SAC plausibly alleges that it had suspicion of underlying fraud in the Madison Custody Account, the factual allegations in the SAC do not plausibly support that Deutsche Bank made a deliberate decision to avoid confirming that fraudulent activity.  (Def. Br. 23).  In support of this argument, Deutsche Bank points to the facts in the SAC alleging that Deutsche Bank undertook a periodic review of the Madison account and continued to request additional information from Madison five times before closing the Madison Custody Account. (SAC ¶¶ 120, 128, 143–44).  But the SAC includes facts supporting that Deutsche Bank already knew much of the information that Deutsche Bank requested in these periodic reviews.  (SAC ¶¶ 45, 128).  Moreover, the SAC alleges that, in late 2016 and early 2017, when Deutsche Bank requested information on the Madison-managed entities and related account activity, "representatives for the Madison managed entities either did not respond, stalled and made excuses, or sent incomplete information such that Deutsche's information requests remained outstanding for several months."  (SAC ¶ 143).  Yet, Deutsche Bank continued to maintain the Madison Custody Account, which allowed Madison to continue processing millions in wrongful cash transfers.  (SAC ¶ 144, Ex. F).  According to the SAC, Deutsche Bank also never inquired of Mr. Trujillo, specifically about the suspicious wire activity in the Madison custody account.  (SAC ¶¶ 89–90, 145).

Examining the totality of the allegations in the SAC and drawing all reasonable inferences in Plaintiffs' favor, *see Hernandez*, 939 F.3d at 198, Plaintiffs' have plead sufficient factual allegations from which to draw the reasonable inference that Deutsche Bank was "knowingly" a party to the carrying on of Madison's fraud.

## <u>CONCLUSION</u>

Accepting all well pleaded allegations as true and drawing all reasonable inferences in Plaintiffs' favor, the SAC adequately alleges facts to support an inference that Deutsche Bank participated in the carrying on of Madison's fraudulent conduct knowingly.  Accordingly, Deutsche Bank's Motion to Dismiss is DENIED.

Deutsche Bank is directed to file its answer to the SAC within fourteen days of the date of this opinion.

The clerk of court is respectfully requested to terminate docket entry 44.

**SO ORDERED.**

**Date:   March 30, 2022**
**        New York, NY**

**MARY KAY VYSKOCIL**
**United States District Judge**